IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 21-32112 |
| HAWAIIAN VINTAGE CHOCOLATE | § | |
| COMPANY, INC., | § | Chapter 11 |
| | § | |
| DEBTOR. | § | |

## DISCLOSURE STATEMENT FOR
## DEBTOR'S PREPACKAGED CHAPTER 11 PLAN

WICK PHILLIPS GOULD & MARTIN, LLP

Jason M. Rudd, Tex. Bar No. 24028786
Scott D. Lawrence, Tex. Bar No. 24087896
Catherine A. Curtis, Tex. Bar No. 24095708
3131 McKinney Ave, Suite 500
Dallas, Texas 75204
Telephone: 214-692-6200
jason.rudd@wickphillips.com
scott.lawrence@wickphillips.com
catherine.curtis@wickphillips.com

PROPOSED COUNSEL FOR DEBTOR

Dated: November 22, 2021

## IMPORTANT INFORMATION FOR YOU TO READ

THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE DEBTOR'S PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION BEFORE AND AFTER THE FILING OF VOLUNTARY REORGANIZATION CASE UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532 (THE "BANKRUPTCY CODE"). BECAUSE THE CHAPTER 11 CASE HAS NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY A BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE OR AS BEING IN COMPLIANCE WITH SECTION 1126(b) OF THE BANKRUPTCY CODE. FOLLOWING COMMENCEMENT OF THE CHAPTER 11 CASE, THE DEBTOR EXPECTS TO PROMPTLY SEEK ENTRY OF AN ORDER OF THE BANKRUPTCY COURT (I) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION UNDER SECTION 1125(a) OF THE BANKRUPTCY CODE, (II) APPROVING THE SOLICITATION OF VOTES ON THE PLAN AS HAVING BEEN IN COMPLIANCE WITH SECTION 1126(b) OF THE BANKRUPTCY CODE, AND (III) CONFIRMING THE PLAN.

YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.

## RECOMMENDATION OF THE DEBTOR

THE BOARD OF DIRECTORS OF THE DEBTOR, AS APPLICABLE, HAS UNANIMOUSLY APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT.

THE DEBTOR BELIEVES THAT THE TRANSACTIONS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTOR'S ESTATE, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS. THE DEBTOR BELIEVES THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR IMPLEMENTING A RESTRUCTURING OF THE DEBTOR. THE DEBTOR STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

All Holders of Claims or Equity Interests are advised and encouraged to read this Disclosure Statement and the Plan in their entirety. Plan summaries and statements made in this Disclosure Statement, including the following summary, are qualified in their entirety by reference to the Plan and other exhibits annexed to the Plan. The statements contained in this Disclosure Statement are made only as of the date hereof, and there can be no assurance that the statements contained herein will be correct at any time after the date hereof.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure and not necessarily in accordance with federal or state securities laws or other applicable law. The SEC has neither approved nor disapproved this disclosure statement, nor has it passed upon the adequacy or accuracy of the statements contained herein.

This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtor or any other party, nor shall it be construed to be advice on the tax or other legal effects of the Plan on Holders of Claims or Equity Interests.

The Debtor is providing this Disclosure Statement to Holders of Claims or Equity Interests, for their information only. Nothing in this Disclosure Statement may be used or relied upon by any person or entity for any other purpose.

Upon Confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act, or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. Other Securities may be issued pursuant to other applicable exemptions under the federal securities laws. To the extent exemptions from registration under section 1145 of the Bankruptcy Code or applicable federal securities law do not apply, the Securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

The Debtor makes statements in this Disclosure Statement that are considered forward looking statements under federal securities laws. The Debtor considers all statements regarding anticipated or future matters, to be forward-looking statements. Forward-looking statements may include statements about the Debtor's:

- business strategy;
- acquisition or disposition of assets, including strategy, amount, timing, and ability to effectuate any such transaction;
- financial strategy;
- risks associated with the Chapter 11 process, including the Debtor's ability to develop, confirm, and consummate a plan under Chapter 11 or an alternative restructuring transaction;
- credit and capital market conditions;
- plans, objectives, expectations and intentions; and
- benefits of a strategic merger.

**EXHIBITS TO DISCLOSURE STATEMENT**

EXHIBIT A.   Chapter 11 Prepackaged Plan

EXHIBIT B.   Organizational Chart of Reorganized Debtor

EXHIBIT C.   Reorganized Debtor's Pro Forma Projections

# TABLE OF CONTENTS

DISCLOSURE STATEMENT DATED NOVEMBER 22, 2021 ................................................. 1

I. EXECUTIVE SUMMARY ................................................................................... 1

II. GENERAL INFORMATION ............................................................................... 8

    A.      PURPOSES OF THIS DISCLOSURE STATEMENT ........................................ 8

    B.      GENERAL INFORMATION CONCERNING CHAPTER 11 ........................... 9

    C.      GENERAL INFORMATION CONCERNING TREATMENT OF
            CLAIMS AND INTERESTS.................................................................................. 9

    D.      CLASSES IMPAIRED UNDER THE PLAN ..................................................... 10

    E.      VOTING .................................................................................................................. 10

    F.      CONFIRMATION ................................................................................................. 11

          1.      Requirements of Section 1129(a) of the Bankruptcy Code ...................... 11

          2.      Acceptance of the Plan........................................................................ 12

          3.      Confirmation without Acceptance by all Impaired Classes...................... 12

          4.      Best Interests Test .................................................................................. 13

III. BACKGROUND AND EVENTS LEADING UP TO CHAPTER 11 ................................. 14

IV. THE PREPACKAGED PLAN AND BANKRUPTCY CASE ........................................... 15

    A.      BAR DATES ........................................................................................................... 16

    B.      CLAIMS AGAINST THE DEBTOR ................................................................. 16

          1.      In General.................................................................................................. 16

          2.      Administrative Expense Claims.............................................................. 17

V. THE PLAN ......................................................................................................... 17

    A.      CLASSIFICATION AND TREATMENT OF CLAIMS AND
            EQUITY INTERESTS UNDER THE PLAN...................................................... 17

1.      Class 1: Priority Non-Tax Claims .............................................................. 17

2.      Class 2: Secured Claims ............................................................................ 17

3.      Class 3: Lender Postpetition Claims ......................................................... 18

4.      Class 4: General Unsecured Claims ........................................................... 18

5.      Class 5: Equity Interests ............................................................................ 19

B.      ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS ................................................................................................... 19

C.      IMPLEMENTATION OF THE PLAN ..................................................... 20

1.      Restructuring Transactions ....................................................................... 20

2.      Cancellation of Existing Securities and Agreements ................................ 21

3.      Reorganized Debtor .................................................................................. 21

4.      Authorization of New Common Stock ..................................................... 22

VI. ADDITIONAL PROVISIONS AND EFFECT OF THE PLAN ........................................ 22

A.      LEGAL EFFECT OF THE PLAN ........................................................... 22

1.      Exculpations ............................................................................................. 22

2.      Injunction and Stay .................................................................................. 22

3.      Vesting of Assets ...................................................................................... 23

4.      Debtor and Estate Releases ...................................................................... 23

B.      MODIFICATION OR REVOCATION OF THE PLAN; SEVERABILITY ....................................................................................... 24

C.      RETENTION OF BANKRUPTCY COURT JURISDICTION ........................... 24

D.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................. 24

1.      Rejection of Executory Contracts and Unexpired Leases ......................... 24

2.      Claims based on Rejection of Executory Contracts or Unexpired Leases ........................................................................................ 24

E.      DISTRIBUTIONS UNDER THE PLAN ................................................. 24

F.      OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS ................................. 25

G.      MANAGEMENT OF THE REORGANZIED DEBTOR ..................................... 25

VII. CERTAIN RISK FACTORS AND BEST INTERESTS TEST ........................................... 25

A.      RISKS TO CONFIRMATION AND EFFECTIVENESS.................................... 25

B.      ALTERNATIVES TO CONFIRMATION........................................................... 27

VIII. SECURITIES LAWS DISCLOSURES............................................................................. 27

A.      PLAN CONSIDERATION.................................................................................. 27

B.      EXEMPTION FROM REGISTRATION REQUIREMENTS;
ISSUANCE AND RESALE OF NEW COMMON STOCK .............................. 27

       1.      Exemption from Registration Requirements; Issuance and
Resale of New Common Stock ................................................................. 27

       2.      Definition of "Underwriter" Under Section 1145(b) of the
Bankruptcy Code; Implications for Resale of New Common
Stock ....................................................................................................... 28

       3.      Resale of New Common Stock Pursuant to Section 4(a)(2)
Under the Securities Act .......................................................................... 30

IX. LIQUIDATION ANALYSIS AND FEASIBILITY .............................................................. 30

A.      LIQUIDATION ANALYSIS................................................................................ 30

B.      FEASIBILITY ..................................................................................................... 31

X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........................ 32

A.      IN GENERAL..................................................................................................... 32

B.      FEDERAL INCOME TAX CONSEQUENCES TO THE
DEBTOR............................................................................................................. 33

C.      FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS
OF CLAIMS ....................................................................................................... 34

D.      INFORMATION REPORTING AND BACKUP WITHHOLDING.................. 35

E.      IMPORTANCE OF OBTAINING PROFESSIONAL TAX
ASSISTANCE ..................................................................................................... 35

XI. RECOMMENDATION AND CLOSING ............................................................................... 35

## <u>DISCLOSURE STATEMENT DATED NOVEMBER 22, 2021</u>

THE PLAN IS PROPOSED BY HAWAIIAN VINTAGE CHOCOLATE COMPANY, INC., DEBTOR-IN-POSSESSION, WHICH STRONGLY URGES YOU TO VOTE TO ACCEPT IT.

### I. EXECUTIVE SUMMARY

This Disclosure Statement (this "<u>Disclosure Statement</u>") solicits acceptances of the Prepackaged Chapter 11 Plan, dated November 22, 2021 (the "<u>Plan</u>") proposed by Hawaiian Vintage Chocolate Company, Inc. (the "<u>Debtor</u>"), as the proposed debtor and debtor-in-possession in the above-captioned to be filed chapter 11 case.

The purpose of this Disclosure Statement is to enable Holders of Claims[1] or Equity Interests Impaired under the Plan and who may receive a distribution under the Plan to make an informed decision in exercising their right to vote to accept or reject the Plan.

The Plan, which is attached hereto as **<u>Exhibit A</u>**, provides a significant recovery to all Allowed Claims against and Equity Interests in the Debtor's Estate through (i) distribution of shares in the Reorganized Debtor and the Reorganized Debtor's proposed newly formed subsidiary; and (ii) the proposed merger of the Reorganized Debtor with AZOTH, Inc., and the new subsidiary with Inner State Health, Inc.

The Debtor's Lender agreed to fund the proposed bankruptcy process with up to $150,000 in post-petition financing, enabling the Debtor to effectuate the proposed mergers and reorganization described below to bring value to the Debtor's Claim Holders and Interest Holders, one of which is Lender. The Lender is the Debtor's largest prepetition non-insider creditor, a Delaware merchant bank established in 1998. The Lender's past dealings with Debtor include accounts receivable financing and bridge loans, from which Lender holds the largest non-insider pre-petition unsecured Claim against the Estate. The Lender is funding the Chapter 11 case's administrative expenses, priority claims and other cash needs and has agreed to convert its prepetition unsecured Claims and post-petition financing claim into shares of new common stock the Reorganized Debtor issues pursuant to the Plan. The filing of the Chapter 11 case and proposed mergers present the only feasible means for satisfying the Lender's pre-petition Claim or otherwise providing any meaningful value to creditors.

**The Reorganized Debtor and Effective Date Mergers**. As detailed later in this Disclosure Statement, the Debtor ceased active business operations, presents no significant going concern value and only liquidation value for its agricultural IP and related process assets; however, by merging with existing operating entities and combining the Debtor's unique assets with the merger targets, the Reorganized Debtor and its proposed subsidiaries present the opportunity to return significant value to Claim Holders and Interest Holders by issuing new stock in exchange for prepetition Claims and Equity Interests. The Plan proposes two key value focused transactions, the Azoth, Inc. merger and the Inner State, Inc. merger (together, the "<u>Mergers</u>"), each described below. An organizational chart showing the post-merger structure is attached hereto as **<u>Exhibit B</u>**.

---

[1] Capitalized terms not otherwise defined herein are used as defined in the Plan.

**Azoth, Inc**. **Merger** - The Plan proposes for the Reorganized Debtor to merge with Azoth, Inc. ("Azoth"), with the post-merger Reorganized Debtor changing its name to KIMO, Inc. (the "Azoth Merger"). Azoth, Inc. is a Delaware corporation with a successful track record for the manufacture, distribution, and marketing of branded spirits products in the United States with offerings in the agave spirits market through its flagship brand Kimo Sabe, in the craft distilling market with its Surf City brand of bourbon, whiskey, vodka, rum, gin and seltzers, and national distribution of its Ready to Drink ("RTDs") cocktails under its Luminar brand.

Azoth holds three separate operating units, DWLL LLC ("DWLL Sub"), Surf City Still Works LLC ("Surf City Sub"), and Kimo Sabe S.A.P.I. de CV ("Kimo Sabe Sub", together with the DWLL Sub and the Surf City Sub, the "Target Subs").

- The DWLL Sub produces and markets alcoholic agave products primary through its two brands Kimo Sabe and Luminar. Its Kimo Sabe products are distributed and sold in 16 states while its Luminar products in partnership with Total Wine are sold in 32 states.
- The Surf City Sub operates a 25,000 square foot California state-of-the-art distillery facility with distillery, brewery and winery licenses. The Surf City Sub is in process of adding a tasting room, restaurant and retail store to make the distillery a favored destination for Orange County, California's 52 million annual tourist visits.
- Kimo Sabe Sub serves as Azoth's Mexican operational arm. Organized in 2013 to source raw material, manufacture spirit-based products, distribute Azoth group products within Mexico, to export products to its US operations and to maintain standards and quality control for all products produced in Mexico. Kimo Sabe also coordinates Azoth's give back programs of agave donations and micro financing to artisans and small producers.

The Reorganized Debtor will own the Target Subs and deploy the Debtor's agricultural IP for upgrading agave cultivation methods, applying the Debtor's cloning and field engineering techniques. It will also produce a line of liquor-based chocolates featuring the Kimo Sabe mezcal and Surf City whiskies. It is anticipated that the Debtor's independent grower systems will be utilized in the small grower programs used in Mexico.

The Reorganized Debtor's growth strategy focuses on developing, manufacturing, and promoting new generation beverages and related products both alcoholic and non-alcoholic in the "better for you" consumer category. Better for you nomenclature refers to beverages with attributes the consumer perceives as healthy or less harmful than mainstream offerings and represents one of the fastest growing beverage market sectors. Examples of this are low calorie, less high alcohols, nutritional benefits, organic, hand crafted, farm to table, all natural, less sugar, probiotic, hydrating electrolytes, etc. Azoth's existing products have one or several of these attributes and following its merger with the Debtor to form KIMO, the Reorganized Debtor's new products to be introduced in 2022 will focus on better for you attributes in both the alcoholic and non-alcoholic categories. **Exhibit C** includes the Reorganized Debtor's pro forma financials demonstrating the significant long-term value the Plan provides to stakeholders through the Azoth Merger.

**Inner State Inc. Merger** – The Plan also proposes for the Reorganized Debtor to form a wholly owned subsidiary - in addition to the Target Subs - called Inner State Health, Inc. (the "ISH Sub") to merge (the "ISI Merger") with Inner State, Inc. ("ISI").

Inner State, Inc. is an entheogenic and functional plant-based wellness company formed to provide natural plant-based alternatives to anxiety, depression, female endocrinologic issues, and general cognitive skill enhancements. "Entheogenic" describes plants that have medicinal and often hallucinogenic or spiritual properties such as psilocybin, dimethyltryptamine, ayahuasca and peyote. The U.S. Drug Enforcement Administration and Food and Drug Administration have federally approved synthesized psilocybin for research use only.

The ISI Merger permits the ISH Sub to incorporate the Debtor's field-tested growing and hybridization system to advance its grow house technology, lower its costs, and increase the company's branded products efficacy. The ISH Sub will also issue new shares of stock directly to the Debtor's Claim Holders and Interest Holders, in addition the indirect benefit they receive from the Reorganized Debtor's ownership share of ISH Sub. **Exhibit C** includes the Reorganized Debtor's pro forma financials for the ISH Sub.

**Reorganized Debtor Ownership -** An organizational chart showing the post-merger structure is attached hereto as **Exhibit B**.

KIMO Ownership - On the Effective Date, the Reorganized Debtor's new organizational documents will authorize issuance of up to 100,000,000 shares of KIMO Common Stock pursuant to the exemption provided under Bankruptcy Code Section 1145. The Plan distributes over one million shares of the Reorganized Debtor's KIMO Class A Common Stock to the Debtor's Claim Holders and Interest Holders as detailed in the Plan treatment summary below. Azoth, Inc.'s existing shareholders will receive approximately 24 million shares of KIMO Common Stock, with approximately 12 million KIMO Class A Common Stock shares issued to Azoth's existing class A shareholders. In addition to the shares of KIMO Class B Common Stock the Plan distributes Claim Holders and Interest Holders, they also receive a Pro Rata distribution of KIMO Warrants of varying exercise prices and expirations for additional opportunities to benefit from KIMO's expected growth. Here is a summary of KIMO's New Common Stock Ownership on the Effective Date:

| Recipients | Amount |
|---|---|
| **KIMO Class B Common Stock** | **17,182,316** |
| Class 3 - Lender Postpetition Claims | 40,388 |
| Class 4 - Debtor's General Unsecured Creditors | 100,969 |
| Class 5 - Debtor's Equity Interest Holders | 868,336 |
| Azoth, Inc. Class B Shareholders | 12,172,623 |
| Reserve (includes Warrants) | 6,009,698 |
| **KIMO Class A Common Stock** | **12,060,000** |
| Azoth, Inc. Class A Shareholders | 12,060,000 |
| **KIMO Six Month Warrants** | **200,000** |
| Class 3 - Lender Postpetition Claims | 8,000 |

| | | |
|---|---|---:|
| | **Class 4 - Debtor's General Unsecured Creditors** | 20,000 |
| | **Class 5 - Debtor's Equity Interest Holders** | 172,000 |
| **KIMO Twelve Month Warrants** | | **300,000** |
| | **Class 3 - Lender Postpetition Claims** | 12,000 |
| | **Class 4 - Debtor's General Unsecured Creditors** | 30,000 |
| | **Class 5 - Debtor's Equity Interest Holders** | 258,000 |
| **KIMO Twenty-Four Month Warrants** | | **300,000** |
| | **Class 3 - Lender Postpetition Claims** | 12,000 |
| | **Class 4 - Debtor's General Unsecured Creditors** | 30,000 |
| | **Class 5 - Debtor's Equity Interest Holders** | 258,000 |

ISH Ownership - On the Effective Date, the Reorganized Debtor shall incorporate ISH as Delaware corporation and wholly owned subsidiary of the Reorganized Debtor. ISH will merge with ISI and the Reorganized Debtor will spinoff ISH as a separate free standing public entity. The Plan authorizes ISH to issue up to 75 million shares of ISH Common Stock pursuant to the exemption provided under Bankruptcy Code Section 1145, of which the Plan allocates approximately 2 million ISH Class B Common Stock shares to Claim Holders and Interest Holders of the Debtor as detailed below. ISI's existing shareholders will receive approximately 9.6 million shares of ISH Common Stock, with approximately 8 million ISH Class A Common Stock shares issued to ISI's existing class A shareholders. In addition to the shares of ISH Class B Common Stock the Plan distributes Claim Holders and Interest Holders, they also receive a Pro Rata distribution of ISH Warrants of varying exercise prices and expirations for additional opportunities to benefit from ISH's expected growth. Here is a summary of ISH's New Common Stock Ownership on the Effective Date:

| Recipients | | Amount |
|---|---|---:|
| **ISH Class B Common Stock** | | **16,000,000** |
| | **Class 3 - Lender Postpetition Claims** | 15,000 |
| | **Class 4 - Debtor's General Unsecured Creditors** | 37,500 |
| | **Class 5 - Debtor's Equity Interest Holders** | 322,500 |
| | ISI Shareholders | 1,598,000 |
| | Reserve (includes Warrants) | 14,027,000 |
| **ISH Class A Common Stock** | | **8,000,000** |
| | ISI Shareholders | 8,000,000 |
| | Reserve | n/a |
| **ISH Six Month Warrants** | | **200,000** |
| | **Class 3 - Lender Postpetition Claims** | 8,000 |
| | **Class 4 - Debtor's General Unsecured Creditors** | 20,000 |
| | **Class 5 - Debtor's Equity Interest Holders** | 172,000 |
| **ISH Twelve Month Warrants** | | **200,000** |
| | **Class 3 - Lender Postpetition Claims** | 8,000 |
| | **Class 4 - Debtor's General Unsecured Creditors** | 20,000 |
| | **Class 5 - Debtor's Equity Interest Holders** | 172,000 |
| **ISH Twenty-Four Month Warrants** | | **200,000** |

| | | |
|---|---|---|
| | **Class 3 - Lender Postpetition Claims** | 8,000 |
| | **Class 4 - Debtor's General Unsecured Creditors** | 20,000 |
| | **Class 5 - Debtor's Equity Interest Holders** | 172,000 |

**The Debtor's Proposed Disclosure Statement and Solicitation Process** - The Debtor commenced a prepackaged solicitation of the Plan on the date hereof by delivering a copy of the Plan and this related Disclosure Statement (including Ballots) to Holders of Class 3 Lender Claims, Class 4 General Unsecured Claims, and Class 5 Equity Interest Claims (altogether, the "Voting Classes"), the only Classes entitled to vote to accept or reject the Plan. The Debtor has established December 13, 2021 as the deadline for the receipt of votes to accept or reject the Plan (the "Voting Deadline").

The Debtor expects that they will commence the Chapter 11 Cases on or about November 29, 2021. The Debtor will seek Bankruptcy Court approval of the Voting Deadline at the outset of the Chapter 11 Case. As soon as practicable after the Voting Deadline, the Debtor will file with the Bankruptcy Court the Voting Report setting forth the voting results for Voting Classes. Based on the consent of the Lender and a majority of the Voting Classes, the Debtor believe that the Voting Report likely will show that the Holders of Claims entitled to vote on the Plan have overwhelmingly voted to accept the Plan. Accordingly, on the Petition Date, the Debtor intends to file the Plan, this Disclosure Statement, and a motion to approve certain procedures for solicitation of the Plan (the "Solicitation Procedures") and schedule the Confirmation Hearing to consider approval of this Disclosure Statement and Confirmation of the Plan. The following table sets forth the timetable for the solicitation process and the anticipated Chapter 11 Case (the "Confirmation Schedule"):[2]

| **Proposed Date and Time** | **Event** |
|---|---|
| November 22, 2021 | Voting Record Date[3] |
| November 22, 2021 | Commence Solicitation |
| November 30, 2021 | Petition Date |
| December 1, 2021 | Confirmation Hearing Notice Date |
| December 13, 2021 | Voting Deadline |
| December 15, 2021 at 5:00 p.m. prevailing central time | Objection Deadline |
| December 20, 2021 | Deadline for Filing Replies to Confirmation Objections |
| December 22, 2021 | Confirmation Hearing |

---

[2] The dates set forth in this table, herein throughout, and in the exhibits hereto are proposed only and are subject in all respects to the Court's calendar and approval. To the extent that any proposed date needs to be modified to comply with the Court's calendar, all other dates may be modified accordingly.

[3] The "Voting Record Date" is the date as of which a holder of record of a claim entitled to vote on the Plan must have held such claim or interest to cast a vote to accept or reject the Plan.

**Proposed Classes under the Plan -** A summary of the classification and treatment of Holders of Claims and Equity Interests under the Plan is as follows:[4]

| Class | Description | Entitled to Vote | Estimated Claims | Approx. Recovery | Treatment |
|---|---|---|---|---|---|
| **Class 1** | Priority Non-Tax Claims | No | $0.00 | NA | Full payment of Allowed Claim in Cash. |
| **Class 2** | Secured Claims | Yes | $0.00 | 100% | At the Debtor's choice, (i) return of the collateral securing such Allowed Secured Claim; or (ii) cash distributions from the Reorganized Debtor totaling the amount of the Allowed Secured Claim, paid in five equal annual installments, plus interest at 6% per annum, secured by the collateral securing such Allowed Secured Claim. |
| **Class 3** | Lender Postpetition Claims | Yes | $150,000 | 100% | • 40,388 shares KIMO Class B Common Stock<br>• 8,000 KIMO Six Month Warrants<br>• 12,000 KIMO Twelve Month Warrants<br>• 12,000 KIMO Twenty-Four Month Warrants<br>• 15,000 shares ISH Class B Common Stock<br>• 8,000 ISH Six Month Warrants<br>• 8,000 ISH Twelve Month Warrant<br>• 8,000 ISH Twenty-Four Month Warrants |
| **Class 4** | General Unsecured Claims | Yes | $1,016,039 | 100% | A Pro Rata share of:<br>• 100,969 shares KIMO Class B Common Stock<br>• 20,000 KIMO Six Month Warrants<br>• 30,000 KIMO Twelve Month Warrants<br>• 30,000 KIMO Twenty-Four Month Warrants<br>• 37,500 shares ISH Class B Common Stock<br>• 20,000 ISH Six Month Warrants<br>• 20,000 ISH Twelve Month Warrants<br>• 20,000 ISH Twenty-Four Month Warrants |
| **Class 5** | Equity Interests | Yes | 16,260,546 shares | NA | A Pro Rata share of:<br>• 868,336 share KIMO Class B Common Stock<br>• 172,000 KIMO Six Month Warrants<br>• 258,000 KIMO Twelve Month Warrants<br>• 258,000 KIMO Twenty-Four Month Warrants<br>• 322,500 shares ISH Class B Common Stock<br>• 172,000 ISH Six Month Warrants<br>• 172,000 ISH Twelve Month Warrants<br>• 172,000 ISH Twenty-Four Month Warrants |

The Debtor believes that the Plan is in the best interests of Holders of Claims and Equity Interests. Accordingly, Holders of Claims and Equity Interests who are entitled to vote are urged to vote in favor of the Plan. **To be counted, your ballot must be fully completed, executed and actually received by Wick Phillips Gould & Martin, LLP c/o Catherine Curtis (the**

---

[4] The estimated claim amounts set forth herein are based on the Debtor's best estimates. The Plan contemplates empowering the Reorganized Debtor to object to claims against the Estate. The estimates stated in this Disclosure Statement, including all attachments hereto, are (1) not final, (2) subject to revision without notice, and (3) not binding on the Debtor or Reorganized Debtor as to the amount or allowability of any Claims or Interests.

"**Tabulation Agent**") at the following physical address or via electronic mail no later than 5:00 p.m. (prevailing Central Time) on December 13, 2021 (the "**Voting Deadline**"):

> **Wick Phillips Gould & Martin, LLP**
> **Attn: Catherine Curtis, Tabulation Agent**
> **3131 McKinney Ave., Suite 500**
> **Dallas, Texas 75204**
> **Email: catherine.curtis@wickphillips.com**

Holders of Claims and Equity Interests who are entitled to vote should carefully read this Disclosure Statement and the Plan in their entirety prior to voting on the Plan. Each Holder of a Claim or Equity Interest should consult its individual attorney, accountant, and/or financial advisor as to the effect of the Plan on such Holder.

Pursuant to section 1128(a) of the Bankruptcy Code, a hearing to approve this Disclosure Statement and the Plan on a final basis (the "Combined Hearing") will be request before the United States Bankruptcy Judge, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), 1100 Commerce Street, Dallas, Texas 75242. At the Combined Hearing, the Court will determine whether the Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code, the Debtor's prepetition solicitation of acceptances in support of the Plan complied with section 1126(b) of the Bankruptcy Code, and the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed. **Due to ongoing COVID pandemic precautions, the Bankruptcy Court may conduct the Combined Hearing remotely through telephone or video conferencing. Information regarding such options for the Combined Hearing will be disseminated in a notice of the Combined Hearing to be distributed once available. Contact counsel for the Debtor, Catherine Curtis, at catherine.curtis@wickphillips.com or 214-420-4049 for more information.**

The notice of the Combined hearing will also set a deadline for objections to the Disclosure Statement which must be filed and served so as to be actually received by the Court, the Debtor, the Debtor's counsel, and the U.S. Trustee, on or before that deadline (the "DS Objection Deadline") and simultaneously served on the following parties:

> COUNSEL TO THE DEBTOR
> Jason M. Rudd
> Scott D. Lawrence
> Catherine A. Curtis
> WICK PHILLIPS GOULD & MARTIN, LLP
> 3131 McKinney Ave., Suite 500
> Dallas, Texas 75204
> Email: jason.rudd@wickphillips.com
>           scott.lawrence@wickphillips.com
>           catherine.curtis@wickphillips.com

Objections to the Disclosure Statement are governed by Bankruptcy Rule 9014. If an objection to the Disclosure Statement is not timely filed and served, the Bankruptcy Court may not consider it.

For the convenience of Claim and Equity Interest Holders, this Disclosure Statement summarizes the terms of the Plan. However, the Plan and any Exhibits and Schedules thereto are the operative documents and govern.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN AS A DESCRIPTION OF THE PLAN IN THE CHAPTER 11 CASE, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR, THE LENDER, OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE LEGAL EFFECT OF THE PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS, BY ITS NATURE, FORWARD LOOKING, AND CONTAINS ESTIMATES, FORECASTS AND ASSUMPTIONS WHICH MAY PROVE TO BE MATERIALLY DIFFERENT FROM ACTUAL RESULTS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED. NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT OR THE DATE ON WHICH THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT OR INDEPENDENT VERIFICATION. THE INFORMATION CONTAINED HEREIN AND THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE WITHOUT INACCURACY.

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to those terms in the Plan.

## II. GENERAL INFORMATION

### A. PURPOSES OF THIS DISCLOSURE STATEMENT

This Disclosure Statement has been prepared by the Debtor to provide information that the Bankruptcy Court has determined to be material and necessary to enable Holders of Claims and Equity Interests, who are entitled to vote on the Plan, to make an informed judgment about the Plan. Confirmation of a plan pursuant to chapter 11 of the Bankruptcy Code depends, in part, upon the receipt of a sufficient number of votes in favor of the Plan. However, Holders of Claims and Equity Interests whose claims are unimpaired are deemed to have conclusively accepted the Plan and are not entitled to vote thereon. As set forth in this Disclosure Statement, Holders of Claims

in Class 1 are unimpaired, conclusively deemed to have accepted the Plan and not entitled to vote to accept or reject the Plan. The Holders of claims in Classes 2, 3, 4, and 5 are Impaired and entitled to vote to except or reject the Plan.

The Bankruptcy Court will conduct a hearing to consider approving this Disclosure Statement as containing "adequate information." "Adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical investor typical of the Holders of Claims and Equity Interests in the Chapter 11 Case that would enable such hypothetical investor to make an informed judgment about the Plan. The Debtor will request the Bankruptcy Court combine the hearing on the Disclosure Statement with Confirmation of the Plan.

## B.     GENERAL INFORMATION CONCERNING CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor in possession attempts to reorganize or liquidate its business for the benefit of itself, its claim holders, and equity interest holders.

The commencement of a chapter 11 case creates an estate, comprised of all of a debtor's legal and equitable interests in property as of the date the petition is filed, wherever located and by whomever held. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code. Section 362(a) of the Bankruptcy Code provides for, among other things, an automatic stay of all attempts to collect prepetition debts against the debtor or to otherwise interfere with the Debtor's property or business. Except as otherwise ordered by the Bankruptcy Court, the automatic stay remains in full force and effect until the time a plan of reorganization is confirmed.

The formulation of a plan is the principal purpose of a chapter 11 case. A plan sets forth the means for satisfying the claims against and equity interests in the debtor.

## C.     GENERAL INFORMATION CONCERNING TREATMENT OF CLAIMS AND INTERESTS

A chapter 11 plan may provide for anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. After a chapter 11 plan has been filed, certain holders of claims against or equity interests in a debtor are permitted to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims of a debtor's claim holders and equity interest holders. In compliance therewith, the plan divides claims and equity interests into classes and sets forth the treatment for each class. In accordance with section 1123(a) of the Bankruptcy Code, Administrative Expense Claims have not been classified in the Plan. A plan is also required, under section 1122 of the Bankruptcy Code, to classify claims and equity interests into classes that contain claims and equity interests that are substantially similar to the other claims and equity interests in such class. The Debtor believes that

the Plan has classified all Claims and Equity Interests in compliance with the provisions of Bankruptcy Code section 1122.

Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Claims against and Equity Interests in the Debtor are classified as set forth previously at the beginning of this Disclosure Statement.

## D.    CLASSES IMPAIRED UNDER THE PLAN

Only classes of Impaired Claims or Equity Interests may vote to accept or reject a plan. Modification for purposes of determining impairment, however, does not include curing defaults or reinstating maturity. Classes of claims or Equity Interests that are not "Impaired" under a plan of reorganization, and each member of such class, are conclusively deemed to have accepted the plan and thus are not entitled to vote. Similarly, classes of claims or Equity Interests that will neither receive nor retain any property under a plan are deemed not to have accepted the plan and are thus not entitled to vote. Accordingly, acceptances of a plan will only be solicited from Holders of claims and/or Equity Interests in Impaired classes that may receive distributions under the plan.

The Holders of Claims in Class 1 are unimpaired and are not entitled to vote to accept or reject the Plan. The Debtor is seeking the votes of Holders of Claims classified as:

- Secured Claims in Class 2
- Lender Postpetition Claims in Class 3
- General Unsecured Claims in Class 4
- Equity Interests Claims in Class 5

## E.    VOTING

Holders of Claims in Classes 2, 3, 4, and 5 are Impaired under the Plan and are entitled to vote to accept or reject the Plan. A Ballot casting a vote on the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such Ballot was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

All proofs of claim by Claim Holders of the Debtor (not including Governmental Units), are required to be filed with the Clerk of the Bankruptcy Court by the deadline set by the Bankruptcy Court (the last date to file a claim is referred to as the "Bar Date"). If a claimant already filed a proof of claim with the Bankruptcy Court, or if the claim in question was scheduled by the Debtor as not being contingent, unliquidated, or disputed, a proof of claim need not have been filed. The schedules for the Debtor will be filed with the Bankruptcy Court on the Petition Date and will be available for inspection on the Bankruptcy Court's website at www.txnb.uscourts.gov or upon written request to the Debtor's counsel. Any references in the Plan or this Disclosure Statement to any Claims or Equity Interests shall not constitute an admission of the allowability, existence, nature, extent, or enforceability thereof.

## F. CONFIRMATION

There are two methods by which a plan may be confirmed: (i) the "acceptance" method, pursuant to which all Impaired classes of claims and interests have voted in the requisite amounts to accept the plan and the plan otherwise complies with section 1129(a) of the Bankruptcy Code; and (ii) the "cram-down" method under section 1129(b) of the Bankruptcy Code, which is available even if classes of claims vote against the Plan.

### 1. Requirements of Section 1129(a) of the Bankruptcy Code

Among the requirements for Confirmation are the following: (a) the Plan is accepted by all Impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims or Interests has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims or Interests in all rejecting Impaired Classes; (b) the Plan is feasible; and (c) the Plan is in the "best interests" of Holders of Impaired Claims and Interests (i.e., Holders of Class 2 Claims, Holders of Class 3 Claims, Holders of Class 4 Claims, and Holders of Class 5 Interests).

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the Debtor believes that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor, as the Plan proponent, has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment: (a) made before Confirmation will be reasonable or (b) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtor will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtor liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims and Priority Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

## 2.       Acceptance of the Plan

A plan is accepted by an Impaired class of claims if the holders of at least two-thirds (⅔) in amount and more than one-half (½) in number of the allowed claims in such class that actually vote, vote to accept the plan. A plan is accepted by an Impaired class of equity interests if holders of at least two-thirds (⅔) in amount of allowed equity interests in such class that actually vote, vote to accept the plan.

BALLOTS THAT ARE SIGNED BUT THAT DO NOT EXPRESSLY INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATE BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, WILL BE DISREGARDED.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim or equity interest in an Impaired class entitled to vote or that the plan otherwise be found by the bankruptcy court to be in the best interests of each holder of a claim or equity interest in such class (*see* discussion of "Best Interests Test" below).

## 3.       Confirmation without Acceptance by all Impaired Classes

Under section 1129(b) of the Bankruptcy Code, the Debtor has the right to seek confirmation of the Plan notwithstanding the rejection of the Plan by a class of claims or interests.

A plan may be confirmed notwithstanding its rejection by one or more classes of claims or Equity Interests if, in addition to satisfying the applicable requirements of section 1129(a) of the Bankruptcy Code, the plan (1) is "fair and equitable" with respect to each class of claims or Equity Interests that is Impaired under, and has not accepted, the plan and (2) does not "discriminate unfairly."

A plan is "fair and equitable" under the Bankruptcy Code with respect to a dissenting class of secured claims if either (a)(i) the Holders of such secured claims retain the liens securing such claims and (ii) each Holder of a claim in such class receives deferred cash payments equal to the

present value of such claim; (b) the property subject to the Holders' liens is sold, subject to the Claim Holders' right to credit bid, with the Claim Holders' liens to attach to the proceeds of sale; or (c) the Holders receive the "indubitable equivalent" of their claims.

A plan is "fair and equitable" under the Bankruptcy Code with respect to a dissenting class of unsecured claims if, with respect to such dissenting class either (a) the plan provides that each Holder of a claim of such class receive or retain property of a value equal to the allowed amount of such claim, or (b) no Holders of junior claims or Equity Interests receive or retain any property under the plan on account of such junior claims or interests.

A plan is "fair and equitable" under the Bankruptcy Code with respect to a dissenting class of Equity Interests if, with respect to such dissenting class, either (a) each Holder of an interest of such class shall receive or retain on account of such interest property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which such Holder is entitled, any fixed redemption price to which such Holder is entitled or the value of such interest, or (b) the Holder of any interest that is junior to the interest of such class shall not receive or retain any property on account of such junior interest.

This fair and equitable standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting unsecured class of claims or Equity Interests receives full compensation for its allowed claims or allowed interests, no Holder of claims or interests in any junior class may receive or retain any property under the plan on account of such claims or interests. The Debtor believes that if a non-consensual confirmation is necessary, the requirements for non-consensual confirmation will be met and the Plan will be confirmed despite its rejection by any Impaired dissenting Class of Claims or Equity Interests.

The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal rank. The Debtor believes that the Plan meets this requirement with respect to any class of Equity Interests that might reject the Plan, because all Classes of Claims or Equity Interests entitled to equal priority of payment are being treated the same or have accepted less favorable treatment.

### 4.    Best Interests Test

Notwithstanding acceptance of the Plan by each Impaired Class, in order for the Plan to be confirmed the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Equity Interest in an Impaired Class who has not voted to accept the Plan. Accordingly, if an Impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides for each Holder of a Claim or Equity Interest in such Class to receive or retain on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount each such Holder would receive if the Estate was liquidated under chapter 7 of the Bankruptcy Code on such date.

The Plan provides for repayment of the Lender Note through issuance of New Common Stock. In exchange for receiving shares of the New Common Stock under the Plan, the Lender is providing up to $150,000 in funding to pay administrative expense claims, priority claims and

effectuate the reorganization transactions that provide significant benefits to General Unsecured Claim Holders and Interest Holders.

As the Lender's funding and conversion of the resulting superpriority senior secured claim into new equity is conditioned on confirmation of the Plan, in any liquidation outside of the Plan, including a chapter 7 liquidation, there would be no funding by the Lender or otherwise to pay for administration of the estate and any available assets would go to pay the Lender Note's secured claim and superpriority administrative expense claim. Further, the Mergers result in the Reorganized Debtor owning significant going concern operations in which the Debtor has no current interest, providing substantial value to the Claim Holders and Interest Holders. The Mergers are entirely contingent on Confirmation of the Plan. Thus, any chapter 7 case will necessarily present the significant risk of a much lower recovery, if any, to unsecured Claim Holders. Further, the administrative expenses of a chapter 7 trustee would be paid from the Estate before chapter 11 administrative Claim Holders or Holders of General Unsecured Claims receive any distribution. As a result, and by implication, constituents will receive more under the Plan than what they would otherwise receive if the Chapter 11 Case would be converted and the Debtor was liquidated in chapter 7.

### III. BACKGROUND AND EVENTS LEADING UP TO CHAPTER 11

The Debtor is a publicly traded company that was incorporated in July 1993 under the laws of the State of Hawaii to develop, grow, manufacture, market and brand cocoa and chocolate products. The Debtor's initial corporate strategy led to the development of proprietary Hawaiian cocoa cultivars planted either independently or corporately on the Big Island of Hawaii. The resulting cocoa crops led to the development of the Debtor's concept of varietal chocolate. In process, the Debtor developed unique proprietary planting and propagation systems for cacao, coffee, vanilla, and edible mushrooms. The vanilla and mushroom growing technology underwent field trials for several years both in Hawaii and the Philippines where crop specific post-harvest handling and processing techniques were suggested but due to capital restraints never commercialized.

The Debtor developed cultivars and planted three generations of trees on lands around the Big Island of Hawaii. The Debtor's future depended on the maturation and cultivation of sufficient number of trees around the island to meet it chocolate market needs. Its initial strategy of using independent growers to expand its crop was discontinued due to the lack of agricultural education and training available on the island. The Debtor continued its own corporate planting program with the goal of producing enough of its own cocoa beans for most of its chocolate products. Meanwhile, the Debtor continued to evolve into a retail brand development and marketing company.

In December of 1997, the Debtor went public with the trading of its common stock on the National Association of Securities Dealers OTC Bulletin Board, under the stock symbol "HWVI" to attract the public capital it needed to fund its business plan. Presently, the Debtor's common stock is quoted in the National Quotation Bureau's "Pink Sheets". Beginning in 1998, the Debtor started its transition from an agricultural cocoa genetics and chocolate product development company to an operating company. The Debtor operated as a grower, manufacturer, and marketer of gourmet cocoa and chocolate brands. In its operations, the Debtor grew cocoa trees and

produced and marketed gourmet cocoa and chocolate products manufactured from cocoa beans selected from a variety of locations around the world including beans grown by the Debtor in the State of Hawaii for both wholesale and retail sale to the public.

Because drought conditions in Hawaii adversely effected the Debtor's cultivation activities and the relative infancy of the Debtor's planting program, the Debtor found it necessary to utilize more selected cocoa beans from third-party growers than planned. As a result, the Debtor grew only a portion of the cocoa beans used its chocolate products which increased costs and reduced acceptance and differentiation of the Debtor's products. By 2000, the capital the Debtor attracted proved inadequate to scale its needed agriculture efforts to correct these issues. As a result, the Debtor pivoted away from cultivation to a brand marketing company whose product competed with international brands like Hershey and Nestle while continuing to seek alternatives as an agricultural company, food service supplier, and retailer. Brand partnerships with Pepsi affiliates, functional foods companies, and distribution houses allowed the Debtor to mature beyond its initial purpose, but the conditions inherent in Hawaiian agriculture prevented the Debtor from achieving its original objectives to help Hawaii find an agricultural replacement for its failing pineapple and sugar crops. Competing with international conglomerates required more capital and personnel than the Debtor could sustain. By the early 2000's, the Debtor closed its offices in Hawaii and only had an internet presence. Eventually the Debtor could no longer support significant online marketing efforts becoming a non-operating OTC stock which has traded consistently until recently.

With the advent of the new SEC ruling on non-reporting stocks being delisted, the stock will no longer have any value for the Interest Holders. As of the Petition Date, the Debtor's stock was trading at $0.0006 per share. With only specialized agricultural expertise and trademarks left as assets, the Debtor is seeking the relief of reorganization under chapter 11 of the Bankruptcy Code to maximize value to Claim Holders and Interest Holders. In particular, the Lender holds a sizable pre-petition non-insider claim, and the only feasible way to pay the Lender's claim is to effectuate the Merger outlined above to create new value to satisfy the Lender's claim.

## IV. THE PREPACKAGED PLAN AND BANKRUPTCY CASE

Lacking sufficient going concern operations and cash flow to pay its creditors, the Debtor considered numerous options to create value and satisfy creditor claims, including liquidation of its core IP assets. The Debtor determined that a strategic merger with operating businesses that could capitalize on the Debtor's agricultural IP, cloning, field engineering techniques and independent grower systems presented the best option to generate superior long-term value for all stakeholders. Accordingly, the Debtor, Azoth and ISI reached terms in the form of the proposed Mergers to combine their operations and distribute significant ownership to the Debtor's creditors and shareholders. The Debtor proposes to effectuate the Mergers through the Plan and the Mergers are conditioned on confirmation of the Plan.

The Debtor is distributing this Disclosure Statement and the Plan in advance of filing the Chapter 11 Case to obtain advanced Claim Holder and Interest Holder support for the Plan as a prepackaged plan. Upon the Debtor's receipt of sufficient support from Claim Holders and Interest Holders to confirm the plan as consensual, the Debtor will file the Chapter 11 Case in the Bankruptcy Court and seek expedited confirmation of the Plan, including approval of this Disclosure Statement.

As the Debtor maintains no meaningful prepetition operations, the Debtor anticipates a relatively simple Chapter 11 Case, with minimal motion practice. At this time, the Debtor anticipates filing a motion to approve the Debtor's solicitation of this Disclosure Statement and Plan seeking a Combined Hearing on both the Disclosure Statement and confirmation of the Plan. The Debtor will also file a motion seeking Bankruptcy Court approval of the proposed debtor in possession financing with the Lender in the amount of up to $150,000.00 to fund the Chapter 11 Case. The Debtor will also file applications to approve its employment of the Debtor's counsel.

## A.    BAR DATES

The Bankruptcy Court will set deadlines for Claim Holders and Governmental Units, to file proofs of claim in this case.

Under Section 2.1 of the Plan, requests for payment of administrative expense claims arising prior to the Effective Date must be filed within thirty (30) days after the Effective Date. Professional Persons holding Fee Claims must also file such claims within thirty (30) days after the Effective Date. Under Section 9.3 of the Plan, all claims arising out of the rejection of executory contracts and unexpired leases (if any) must be filed within thirty (30) days after the earlier of (i) the date of entry of an order of the Bankruptcy Court approving such rejection or (ii) the Effective Date.

## B.    CLAIMS AGAINST THE DEBTOR

### 1.    In General

The following is a summary of Claims against the Debtor:

| Claimant | Est. Allowed Claim | Projected Class |
|---|---:|---|
| Mid America Gourmet | $7,345 | Class 4 |
| Allison Investment Corporation | $134,157 | Class 4 |
| WF Trust | $49,537 | Class 4 |
| Senex | $825,000 | Class 4 |
| Est. Total Class 4 | $1,016,039 | |

The Debtor believes the pool of General Unsecured Claims will total approximately $1,016,039. The Debtor is not aware of any secured claims, as all filed liens have expired under the applicable state laws.

The Debtor reserves any and all rights, claims, objections, or other defenses to all Claims. Any objections to claims will be pursued by the Debtor before the Plan's Effective Date and the Reorganized Debtor after the Effective Date. Because this Disclosure Statement is filed and submitted prior to the deadlines for various types of Claims, the information stated above is subject to change as additional claims may be asserted.

2.      **Administrative Expense Claims**

The Debtor believes that, as of the date of entry of the Confirmation Order, there will be no unpaid administrative claims not already covered by carve-outs provided in the Financing Order.

Under the Plan, Allowed Administrative Expense Claims will be paid in full on (or as soon as reasonably practicable after) the later of (A) the Effective Date or (B) ten (10) days after entry of an order by the Bankruptcy Court allowing such Administrative Expense Claim. Requests for payment of Administrative Expense Claims must be filed no later than thirty (30) days following the Effective Date unless an earlier date is set by separate Bankruptcy Court order.

A summary of the Plan and its treatment of all Claims follows.

## V. THE PLAN

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT AS <u>EXHIBIT A</u>. THE PLAN ITSELF AND THE DOCUMENTS REFERENCED THEREIN WILL CONTROL THE TREATMENT OF CLAIM HOLDERS, INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR.**

A.      **CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN**

1.      **Class 1: Priority Non-Tax Claims**

Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against the Estate agrees to a less favorable treatment, each such Holder shall receive, in full satisfaction of such Claim, payment in full in by the Debtor or Reorganized Debtor, as applicable, on (or as soon as reasonably practicable after) the later of (A) the Effective Date or (B) ten (10) days after such Priority Non-Tax Claim becomes Allowed. Holders of Priority Non-Tax Claims are unimpaired, deemed to accept the Plan, and not entitled to vote thereon. The Debtor believes that, as of the Effective Date, there will be no claims in Class 1.

2.      **Class 2: Secured Claims**

On the Effective Date (or as soon as reasonably practicable thereafter), except to the extent that a Holder of an Allowed Secured Claim against the Estate agrees to less favorable treatment,

each Holder of an Allowed Secured Claim shall, at the Debtor's option, receive one of the following treatments: (i) the Collateral securing such Allowed Secured Claim; or (ii) cash distributions from the Reorganized Debtor totaling the amount of the Allowed Secured Claim, paid in five equal annual installments, plus interest at 6% per annum, secured by the Collateral securing such Allowed Secured Claim. Holders of secured claims are Impaired under the Plan and may vote. The Debtor believes that, as of the Effective Date, there will be no claims in Class 2.

3. **Class 3: Lender Postpetition Claims**

Except to the extent that the Holder of the Allowed Lender Postpetition Claim against the Estate agrees to a different treatment, the Holder of an Allowed Lender Postpetition Claim shall receive the following, in full satisfaction of such Claim:

| | Description | Amount |
|---|---|---|
| 1. | KIMO Class B Common Stock | 40,388 |
| 2. | KIMO Six Month Warrants | 8,000 |
| 3. | KIMO Twelve Month Warrants | 12,000 |
| 4. | KIMO Twenty-Four Month Warrants | 12,000 |
| 5. | ISH Class B Common Stock | 15,000 |
| 6. | ISH Six Month Warrants | 8,000 |
| 7. | ISH Twelve Month Warrants | 8,000 |
| 8. | ISH Twenty-Four Month Warrants | 8,000 |

Lender Postpetition Claims are Impaired under the Plan. Holders of Lender Postpetition Claims may vote.

4. **Class 4: General Unsecured Claims**

Except to the extent that a Holder of an Allowed General Unsecured Claim against the Estate agrees to a different treatment, each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction of such Claim, a Pro Rata share of the following:

| | Description | Amount |
|---|---|---|
| 1. | KIMO Class B Common Stock | 100,969 |
| 2. | KIMO Six Month Warrants | 20,000 |
| 3. | KIMO Twelve Month Warrants | 30,000 |
| 4. | KIMO Twenty-Four Month Warrants | 30,000 |
| 5. | ISH Class B Common Stock | 37,500 |
| 6. | ISH Six Month Warrants | 20,000 |
| 7. | ISH Twelve Month Warrants | 20,000 |
| 8. | ISH Twenty-Four Month Warrants | 20,000 |

General Unsecured Claims are Impaired under the Plan. Holders of General Unsecured Claims may vote.

5.    **Class 5: Equity Interests**

Except to the extent that a Holder of an Allowed Equity Interest in the Debtor agrees to a different treatment, all Equity Interests in the Debtor shall be canceled as the Effective Date and each Holder of an Allowed Equity Interest shall receive, in full satisfaction of and replacement of their Allowed Equity Interest, a Pro Rata share of the following:

| | Description | Amount |
|---|---|---|
| 1. | KIMO Class B Common Stock | 868,336 |
| 2. | KIMO Six Month Warrants | 172,000 |
| 3. | KIMO Twelve Month Warrants | 258,000 |
| 4. | KIMO Twenty-Four Month Warrants | 258,000 |
| 5. | ISH Class B Common Stock | 322,500 |
| 6. | ISH Six Month Warrants | 172,000 |
| 7. | ISH Twelve Month Warrants | 172,000 |
| 8. | ISH Twenty-Four Month Warrants | 172,000 |

The Debtor estimates that a Holder of Allowed Equity Interests will receive approximately five (5) shares of KIMO Class B Common Stock, one (1) KIMO Twelve Month Warrant, and two (2) KIMO Twelve Month Warrants and KIMO Twenty-Four Month Warrants for every one hundred (100) shares of the Debtor's common stock the Holder owned on the Petition Date. Equity Interests are Impaired under the Plan. Holders of Equity Interests may vote.

**B.    ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS**

The Bankruptcy Code requires that all Administrative Expense Claims against the Estate be paid in full in cash on the Effective Date of the Plan unless the Holder of such a Claim agrees to a different treatment. Administrative Expense Claims and Priority Tax Claims are not classified under the Plan. Except to the extent the Holder of an Administrative Expense Claim has agreed to a different treatment, each Holder of an Allowed Administrative Expense Claim shall receive, on account of and in full satisfaction of such Claim, Cash in an amount equal to the Allowed amount of such Administrative Expense Claim on (or as soon as reasonably practicable after) the later of (A) the Effective Date or (B) ten (10) days after entry of an order by the Bankruptcy Court allowing such Administrative Expense Claim.

Except to the extent that a Holder of an Allowed Priority Tax Claim has agreed or agrees to a different treatment of such Claim, each Holder of an Allowed Priority Tax Claim shall receive on (or as soon as reasonably practicable after) the Effective Date, at the Debtor's option: (i) Cash in an amount equal to the Allowed amount of such Claim, or (ii) regular installment payments of Cash (a) having a total value, as of the Effective Date, equal to the Allowed amount of the Claim, (b) over a period ending not later than five (5) years after the Petition Date and (c) in a manner not less favorable than the most favored nonpriority Allowed General Unsecured Claims provided for by the Plan (other than Cash payments made to a class of Claim Holders under section 1122(b) of the Bankruptcy Code).

To the extent interest is required to be paid on any Priority Tax Claim, the rate of such interest shall be the rate determined under applicable non-bankruptcy law, as set forth in section

511 of the Bankruptcy Code. To the extent the Holder of an Allowed Priority Tax Claim has a Lien on the Debtor's property, such Lien shall remain in place until such Allowed Priority Tax Claim has been paid in full. On and after the Effective Date, all ad valorem property taxes (if any) will be paid as they become due, in the ordinary course.

Pursuant to Section 2.1 of the Plan, Holders of Administrative Expense Claims arising from the Petition Date through the Effective Date, other than Professional Persons holding Fee Claims, must file with the Bankruptcy Court a request for payment of such Claims within thirty (30) days after the Effective Date. Pursuant to Section 2.2 of the Plan, Professional Persons holding Fee Claims that have not been the subject of a final fee application and accompanying Bankruptcy Court order shall similarly file a final application for payment of fees and reimbursement of expenses no later than the date that is thirty (30) days after the Effective Date.

## C.    IMPLEMENTATION OF THE PLAN

### 1.    Restructuring Transactions

On the Effective Date, the Debtor shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the Azoth Merger and the Inner State Inc. Merger, including issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, and one or more transactions consisting of inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions.

**Azoth Merger** - On the Effective Date, the Debtor shall merge with Azoth, Inc. and the resulting merged Reorganized Debtor shall be renamed "KIMO, Inc." and incorporated in Delaware. The Debtor is authorized to enter into an agreement of merger (as may be amended, revised or supplemented) with Azoth, Inc. and any related agreements or filings without the need for any further corporate or organizational action and without further action by or approval of the Bankruptcy Court. KIMO, Inc. shall be deemed a "successor" to the Debtor and "affiliate" of the Debtor under Section 1145 of the Bankruptcy Code. As a result of the Azoth Merger, the Reorganized Debtor will own and operate the following wholly owned subsidiaries:

      (i)        DWLL LLC,

      (ii)       Surf City Still Works LLC, and

      (iii)     Kimo Sabe S.A.P.I. de CV.

The Reorganized Debtor is authorized to create and issue up to 100,000,000 shares of New Common Stock in KIMO, including KIMO Class A Common Stock, KIMO Class B Common Stock, for distribution and reserve.  A summary of the post-Effective Date ownership of KIMO is included in the Executive Summary above and in the Plan itself.

**Inner State, Inc. Merger** - On the Effective Date, the Reorganized Debtor shall incorporate Inner State Health, Inc. as Delaware corporation and wholly owned subsidiary of the Reorganized Debtor. The Reorganized Debtor is authorized to merge ISH with Inner State, Inc. The resulting merged subsidiary of the Reorganized Debtor shall be named "Inner State Health, Inc.".  The Reorganized Debtor and ISH are authorized to enter into the agreement of merger (as

may be amended, revised or supplemented) with ISI and any related agreements or filings without the need for any further corporate or organizational action and without further action by or approval of the Bankruptcy Court. Inner State Health, Inc. shall be deemed a "successor" to the Debtor and "affiliate" of the Debtor under Section 1145 of the Bankruptcy Code.

As a result of the ISI Merger, the Reorganized Debtor will own ISH and is authorized on the Effective Date to create and issue up to 75,000,000 shares of New Common Stock in ISH, including 8,000,000 shares of ISH Class A Common Stock, 16,000,000 shares of ISH Class B Common Stock, for distribution and reserve. Through the issuance of the ISH Common Stock, the Reorganized Debtor will spin-off ISH, making the ISH Common Stock separately traded from the KIMO Stock. A summary of the post-Effective Date ownership of ISH is included in the Executive Summary above and in the Plan itself.

The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.

### 2. Cancellation of Existing Securities and Agreements

On the Effective Date, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be cancelled and the obligations of the Debtor and any non-Debtor affiliate thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.

### 3. Reorganized Debtor

On the Effective Date, the New Board shall be established, and the Reorganized Debtor shall adopt its New Organizational Documents. The Reorganized Debtor shall have the authority to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.

#### 4. Authorization of New Common Stock

The issuance and/or authorization of the New Common Stock, by the Reorganized Debtor is authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests. All of the shares of New Common Stock issued or authorized in connection with the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. On the Effective Date, the Debtor shall issue all securities, notes, instruments, certificates, and other documents required to be issued on the Effective Date pursuant to the Plan. Specifically, the Reorganized Debtor's New Organizational Documents will authorize issuance of up to 100,000,000 shares of new common stock pursuant to the exemption provided under Bankruptcy Code Section 1145. New Organizational Documents for the Reorganized Debtor's wholly owned subsidiary, ISH, will allow for issuance of a total of up to 75 million shares of ISH common A and B stock.

## VI. ADDITIONAL PROVISIONS AND EFFECT OF THE PLAN

### A. LEGAL EFFECT OF THE PLAN

#### 1. Exculpations

The Plan provides exculpation to the Debtor, the Reorganized Debtor, Allison Investment Corporation, and Wick Phillips Gould & Martin, LLP as the "Exculpated Parties." As provided by the Plan, neither the Exculpated Parties nor any of their respective present or former members, managers, officers, directors, employees, equity Holders, partners, affiliates, funds, advisors, attorneys or agents, or any of their predecessors, successors or assigns, shall have or incur any liability to any Holder of a Claim or an Equity Interest, or any other party-in-interest, or any of their respective agents, employees, equity Holders, partners, members, affiliates, funds, advisors, attorneys or agents, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the administration of the Chapter 11 Case, the negotiation and pursuit of approval of this Disclosure Statement, the preparation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the funding of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, and shall be deemed to have acted in good faith in connection therewith and entitled to the protections of section 1125(e) of the Bankruptcy Code. Notwithstanding anything to the contrary, the Plan shall not exculpate any party from any liability based upon gross negligence or willful misconduct.

#### 2. Injunction and Stay

Except as otherwise expressly provided in the Plan, all Persons or entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Equity Interest against the Estate, the Debtor, the Reorganized Debtor, or other entity released, discharged, or exculpated hereunder, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Estate, the Debtor, the Reorganized Debtor, with respect to any such Claim or Equity Interest, (iii) creating, perfecting, or enforcing any encumbrance of any kind

against the Estate, the Debtor, the Reorganized Debtor, or against the property or interests in property of the Estate, the Debtor, the Reorganized Debtor, as applicable with respect to any such Claim or Equity Interest, (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Estate, the Debtor, the Reorganized Debtor, or against the property or interests in property of the Estate, the Debtor, the Reorganized Debtor, with respect to any such Claim or Equity Interest, or (v) pursuing any Claim released under the Plan.

Unless otherwise provided, all injunctions or stays arising under or entered during the Debtor's Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 3. Vesting of Assets

Upon the Confirmation Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Estate's Assets shall vest in the Reorganized Debtor, free and clear of all Claims, Liens, encumbrances, charges and other interests, except as otherwise provided in the Plan. The Debtor may abandon any asset to the Reorganized Debtor.

### 4. Debtor and Estate Releases

As explained above, as consideration of the Debtor's settlement with the Lender, and the value the Lender is providing the Estate to fund the Plan and related creditor recoveries, the Plan provides releases to the Lender and its affiliates and related parties included in the Plan's definition of "Released Parties".

As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and as otherwise provided in the Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the Debtor, the Reorganized Debtor, and the Estate on behalf of themselves and their successors, assigns, and representatives and any and all other entities that may purport to assert any cause of action derivatively, by or through the foregoing entities (together, the "Releasing Parties"), from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action, losses, remedies, or liabilities, whatsoever, including any derivative claims, asserted or assertable on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that any of the Releasing Parties would have been legally entitled to assert in its own right, or on behalf of the Holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Estate, the Chapter 11 Case, the Lender Settlement, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Case, the restructuring transactions, the negotiation, formulation, or preparation of this Disclosure Statement and the Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence, other than claims or causes of action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, and willful misconduct.

**B.      MODIFICATION OR REVOCATION OF THE PLAN; SEVERABILITY**

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, alterations, amendments or modifications of the Plan may be proposed in writing by the Debtor at any time prior to or after the Confirmation Date. Holders of Claims and Equity Interests that have accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified; provided, however, that any Holders of Claims and Equity Interests who were deemed to accept the Plan because such Claims and Equity Interests were unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modification, such Claims and Equity Interests continue to be unimpaired.

If the Bankruptcy Court determines that any provision of the Plan is unenforceable either on its face or as applied to any Claim or Equity Interest, the Debtor may modify the Plan in accordance with section 13.4 of the Plan so that such provision shall not be applicable to the Holder of any Claim or Equity Interest. Any determination of unenforceability shall not (i) limit or affect the enforceability and operative effect of any other provisions of the Plan; or (ii) require the re-solicitation of any acceptance or rejection of the Plan unless otherwise ordered by the Bankruptcy Court.

**C.      RETENTION OF BANKRUPTCY COURT JURISDICTION**

Following the Confirmation Date, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code.

**D.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**1.      Rejection of Executory Contracts and Unexpired Leases**

The Plan contemplates that the Debtor shall reject each executory contract and unexpired lease to which the Estate is a party, if any. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the contract and lease rejections described above, as of the Effective Date.

**2.      Claims based on Rejection of Executory Contracts or Unexpired Leases**

All Claims arising out of the rejection of executory contracts and unexpired leases (if any) must be served upon the Debtor and its counsel within thirty (30) days after the earlier of (i) the date of entry of an order of the Bankruptcy Court approving such rejection or (ii) the Effective Date. Any Claims not filed within such time shall be forever barred from assertion against the Debtor, the Estate, its property, or the Reorganized Debtor.

**E.      DISTRIBUTIONS UNDER THE PLAN**

In general, distributions and deliveries to be made under the Plan will be made either on the Effective Date or as soon as practicable thereafter. All distributions made by the Debtor or the Reorganized Debtor pursuant to the Plan shall be obtained from cash or the issuance of the New Common Stock.

## F.     OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS

The Debtor and the Reorganized Debtor shall be entitled to object to Claims and Equity Interests, including objections seeking reclassification or subordination of Claims or Equity Interests. If a timely objection is made with respect to any Claim or Equity Interest, no payment or distribution under the Plan shall be made on account of such Claim or Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes Allowed. Any Claim for which a proof of claim is filed after the applicable Bar Date shall be deemed disallowed.

## G.     MANAGEMENT OF THE REORGANZIED DEBTOR

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtor discloses the identity and affiliations of each person proposed to be an officer or to serve on the initial board of directors of any of the Reorganized Debtor. To the extent any such director or officer of the Reorganized Debtor is an "insider" under the Bankruptcy Code, the Debtor also will disclose the nature of any compensation to be paid to such director or officer. Each such director or officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents. As of the Effective Date, the initial Reorganized Board shall consist of the following six directors: (1) James Walsh, Chairman of the Board and CEO, (2) Tom Smith, (3) Ashley Kvamme, (4) Ed Parker, (5) Bruce Culver, and (6) Josh Kornoff. James Walsh will be the only insider as the CEO of the Reorganized Debtor and will have a salary of $1.00. As of the Effective Date, the terms of the current members of the boards of directors, as applicable, of the Debtor shall expire. After the Effective Date, the officers of the Reorganized Debtor shall be appointed in accordance with the respective New Organizational Documents.

## VII. CERTAIN RISK FACTORS AND BEST INTERESTS TEST

## A.     RISKS TO CONFIRMATION AND EFFECTIVENESS

ALL HOLDERS OF IMPAIRED CLAIMS AND IMPAIRED INTERESTS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE EXHIBITS HERETO) PRIOR TO DETERMINING WHETHER AND HOW TO VOTE ON THE PLAN.

BEFORE DETERMINING WHETHER AND HOW TO VOTE ON THE PLAN, YOU SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND, IN PARTICULAR, THE RISKS DESCRIBED BELOW. IF ANY OF THE FOLLOWING RISKS ACTUALLY OCCURS, THE DEBTOR'S BUSINESS, FINANCIAL CONDITION, OR RESULTS OF OPERATIONS COULD BE HARMED. THE RISKS AND UNCERTAINTIES BELOW ARE NOT THE ONLY ONES THE DEBTOR FACES BUT REPRESENT THE RISKS THE DEBTOR BELIEVES ARE MATERIAL. HOWEVER, THERE MAY BE ADDITIONAL RISKS THAT THE DEBTOR CURRENTLY CONSIDERS NOT TO BE MATERIAL OR OF WHICH THE DEBTOR IS NOT CURRENTLY AWARE, AND ANY OF THESE RISKS COULD HAVE THE EFFECTS SET FORTH ABOVE.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the

Bankruptcy Court will confirm the Plan. The requirements for confirmation are set forth in Section 1129 of the Bankruptcy Code, which requires, among other things, a finding by the Bankruptcy Court that confirmation of the Plan is not likely to be followed by a liquidation or need for further financial reorganization, and that the value of the distributions to non-accepting Holders of Claims and Interest Holders would not be less than the value that such Claim Holders or interest Holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtor believes that these requirements will be satisfied, there can be no assurance that the Court will concur.

While the Plan provides that Claim Holders and Holders of Equity Interests would share in a distribution of the New Common Stock, the value of the New Common Stock cannot be estimated with certainty and should be viewed as speculative. THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. THE DEBTOR MAKES NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF SUCH SECURITIES. The Debtor has not obtained a "no action letter" or similar assurance that the New Common Stock issued under the Plan will be freely tradable under applicable law, accordingly, any party trading New Common Stock without registering it, faces regulatory and other legal risks.

The projections included at **Exhibit C** for the Reorganized Debtor and its successors, including KIMO and ISH, are pro forma and subject to change. KIMO's and ISH's actual performance may deviate significantly from these projections - they may not be able to achieve the projected financial results. Further, even if the Plan is consummated, KIMO and ISH will face a number of risks, including risks that are beyond their control, such as deterioration or other changes in economic conditions, changes in the industry, changes in demand for products, and increasing expenses. As a result of these risks and others, there is no guarantee that KIMO and ISH will achieve the stated goals.

The financial projections set forth in this Disclosure Statement represent the Debtor's best estimate for future financial performance, which is necessarily based on speculative assumptions regarding the anticipated future performance of operations, as well as the United States and world economies in general, and the beverage and agricultural segments in which the Debtor operates in particular. While the Debtor believes that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

The Debtor has no duty to update the information contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Debtor is required to do so pursuant to an order of the Bankruptcy Court. Delivery of this Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

Various factors will impact the amount of recoveries that are received under the Plan and, at this time, the Debtor cannot estimate the amount of such recoveries with any degree of certainty. Accordingly, due to the uncertainty of litigation, it is difficult to predict how much the Reorganized Debtor will recover on account of such claims.

**B.      ALTERNATIVES TO CONFIRMATION**

Although this Disclosure Statement is intended to provide information to assist the Holder of a Claim or Interest in determining whether to vote for or against the Plan, a summary of the alternatives to confirmation of the Plan may be helpful.

If the Plan is not confirmed, the following alternatives are available: (a) confirmation of another chapter 11 plan; (b) conversion of the Chapter 11 Case to one under chapter 7 of the Bankruptcy Code; or (c) dismissal of the Chapter 11 Case leaving Holders of Claims and Equity Interests to pursue available non-bankruptcy remedies. These alternatives to the Plan are very limited and not likely to benefit Claim Holders. Although any party in interest could theoretically file a new plan, the most likely result if the Plan is not confirmed is that the Chapter 11 Case will be converted to one under chapter 7 of the Bankruptcy Code.

The Debtor believes that conversion of the Chapter 11 Case to a chapter 7 case would result in (i) significant delay in distributions to all Claim Holders who would have received a distribution under the Plan; and (ii) diminished recoveries for certain classes of Claim Holders due to, among other things, an increase in administrative expenses. If the Chapter 11 Case is dismissed, Claim Holders would be free to pursue non-bankruptcy remedies in their attempts to satisfy Claims against the Debtor. However, in that event, Claim Holders would be faced with the costs and difficulties of attempting, each on its own, to collect on Claims.

# VIII. SECURITIES LAWS DISCLOSURES

**A.      PLAN CONSIDERATION**

The Plan provides for the Reorganized Debtor to distribute New Common Stock in Reorganized Debtor to Holders of Class 3, 4, and 5 Claims and Interests. The Debtor believes that shares of New Common Stock may constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and all applicable state Blue Sky Laws.

**B.      EXEMPTION FROM REGISTRATION REQUIREMENTS; ISSUANCE AND RESALE OF NEW COMMON STOCK**

**1.      Exemption from Registration Requirements; Issuance and Resale of New Common Stock**

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. In reliance upon these exemptions, the offer, issuance and distribution of the New Common Stock in respect of Claims as contemplated by the Plan will not be registered under the Securities Act or any applicable state Blue Sky Laws.

To the extent issuance under Section 1145(a) of the Bankruptcy Code is unavailable and Securities issued under the Plan must instead be issued in reliance on section 4(a)(2) of the Securities Act or Regulation D thereunder, such Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and applicable state and local securities law. The Debtor will seek to obtain, as part of the Confirmation Order, a provision confirming such exemptions.

The Debtor believes that the issuance of the New Common Stock in respect of Claims as contemplated by the Plan is covered by section 1145 of the Bankruptcy Code. Accordingly, the Debtor believes that such New Common Stock may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed in Section VIII.B.2 below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in section 1145(b) of the Bankruptcy Code, or an affiliate of the Reorganized Debtor (or has been such an "affiliate" within 90 days of such transfer). In addition, the New Common Stock generally may be able to be resold without registration under applicable state Blue Sky Laws by a Holder that is not an underwriter or an affiliate of the Reorganized Debtor pursuant to various exemptions provided by the respective Blue Sky Laws of those states. The availability of such exemptions cannot be known, however, unless individual state Blue Sky Laws are examined.

Recipients of the New Common Stock are advised to consult with their own legal advisors as to the availability and applicability of section 1145 of the Bankruptcy Code to such New Common Stock and any other potential exemption from registration under the Securities Act or applicable state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

The Debtor does not have any contract, arrangement, or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent, or any other person for soliciting votes to accept or reject the Plan. The Debtor has received assurances that no person will provide any information to Holders of Claims or Interests relating to the solicitation of votes on the Plan other than to refer such Holders to the information contained in this Disclosure Statement. In addition, no broker, dealer, salesperson, agent, or any other person, is engaged or authorized to express any statement, opinion, recommendation, or judgment with respect to the relative merits and risks of the Plan. Thus, no person will receive any commission or other remuneration, directly or indirectly, for soliciting votes to accept or reject the Plan or in connection with the offer of any Securities that may be the deemed to occur in connection with voting on the Plan.

## 2. Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code; Implications for Resale of New Common Stock

The New Common Stock may be freely transferred by most recipients following the initial issuance under the Plan, subject to any restrictions in the New Organizational Documents, and all resales and subsequent transfers of the New Common Stock are exempt from registration under the Securities Act and state securities laws, unless the Holder is an "underwriter" with respect to such securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who,

except with respect to "ordinary trading transactions of an entity that is not an issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the Holders of such securities; (c) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer," for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized Debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code may suggest that a creditor who owns 10% or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the New Common Stock to be issued in respect of Claims or Interests as contemplated by the Plan would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtor expresses no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock to be issued in respect of Claims or Interests as contemplated by the Plan and, in turn, whether any Person may freely resell such New Common Stock. The Debtor recommends that potential recipients of the New Common Stock to be issued in respect of Claims or Interests as contemplated by the Plan consult their own counsel concerning their ability to freely trade such securities without registration under the federal and applicable state Blue Sky Laws.

Under certain circumstances, Holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is

publicly available and volume limitations, manner of sale requirements and certain other conditions are met.

The foregoing summary discussion is general in nature and has been included in this Disclosure Statement solely for informational purposes. We make no representations concerning, and do not provide, any opinions or advice with respect to the New Common Stock or the bankruptcy matters described in the Disclosure Statement.

### 3. Resale of New Common Stock Pursuant to Section 4(a)(2) Under the Securities Act

Any New Common Stock distributed pursuant to section 4(a)(2) under the Securities Act will be offered, issued and distributed without registration under the Securities Act and applicable state securities laws and in reliance upon the exemption set forth therein. New Common Stock issued pursuant to section 4(a)(2) under the Securities Act will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold under the Securities Act and applicable state securities laws absent an effective registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and pursuant to applicable state securities laws. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions of Rule 144 are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met. The Debtor expresses no view as to whether any person may freely resell the New Common Stock issued pursuant to section 4(a)(2) under the Securities Act.

**THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF SECURITIES ISSUED UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING THEIR ABILITY TO TRADE SUCH SECURITIES IN COMPLIANCE WITH THE FEDERAL SECURITIES LAWS AND ANY APPLICABLE "BLUE SKY" LAWS. THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. THE DEBTOR MAKES NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF SUCH SECURITIES.**

### IX. LIQUIDATION ANALYSIS AND FEASIBILITY

### A. LIQUIDATION ANALYSIS

The Debtor believes that any liquidation analysis is speculative, as such an analysis is necessarily premised on assumptions and estimates, which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtor. Thus, there can be no assurances as to the values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtor's conclusions or concur with such assumptions in making its determination under Section 1129(a)(7). However, the Debtor believes that, under the proposed terms of the Plan, all Holders of Impaired Claims and

Interests will receive property with a value not less than the value such Holders would receive in a chapter 7 liquidation of the Debtor's assets.

The Debtor's belief is based primarily on consideration of the effect that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to Holders of Claims, including (i) increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee and professional advisors to the trustee; (ii) substantial increases in Claims, and (iii) substantial delay in distributions to Holders of Claims and Interests that would likely ensue in a chapter 7 liquidation. In addition, the Debtor believes that Claim Holders will receive more under the Plan than they would in a chapter 7 liquidation due to the following factors:

- The Debtor's Mergers propose to provide significant anticipated value to the Holders of Claims and Interests; however, the Mergers are entirely contingent on confirmation of the Plan. In a chapter 7 liquidation, the Mergers will not occur, and the only value will come from the "fire sale" of the Debtor's assets for a liquidation value anticipated to be less than the costs of administering the liquidation of the Debtor's estate, leaving little or no recovery to creditors.

- In a chapter 7, the Lender will be entitled to assert the Lender Note as a secured claim against the Estate's assets and as a superpriority administrative expenses claim, which would make it difficult for a chapter 7 trustee to recover and distribute as much as the Plan provides to Claim Holders – specifically Holders of General Unsecured Claims and Equity Interests.

- The amount of Claims in a chapter 7 liquidation will be more than the amount of claims that are paid under the Plan, because a chapter 7 trustee would hire new professionals with priority over existing Claim Holders. These additional Claims in a chapter 7 liquidation would cause creditor recoveries to be diluted. Further, the chapter 7 trustee would lack financing and would be required to prosecute litigation claims with contingency fee counsel, eroding the net recovery to the Estate and Claim Holders.

- The Estate lacks meaningful prospects for recovery from Avoidance Actions.

In sum, the Debtor maintains that the Plan provides a superior recover to all Holders of Claims and Interests than a chapter 7 liquidation. The Debtor urges Holders of Claims and Interests to vote in favor of the Plan.

## B.    FEASIBILITY

Pursuant to Section 1129(a)(11) of the Bankruptcy Code, the Debtor must demonstrate that the Bankruptcy Court's confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the Plan. The Plan proposes for Debtor to merge with Azoth, which has a successful track record for the manufacture, distribution and marketing of branded spirits products in the United States.

The Reorganized Debtor will own the Target Subs and deploy the Debtor's agricultural IP for upgrading agave cultivation methods, applying the Debtor's cloning and field engineering techniques. It will also produce a line of liquor-based chocolates featuring the Kimo Sabe mezcal

and Surf City whiskies. It is anticipated that the Debtor's independent grower systems will be utilized in the small grower programs used in Mexico.

The Reorganized Debtor's growth strategy focuses on developing, manufacturing, and promoting new generation beverages and related products both alcoholic and non-alcoholic in the "better for you" consumer category. Better for you nomenclature refers to beverages with attributes the consumer perceives as healthy or less harmful than mainstream offerings and represents one of the fastest growing beverage market sectors. Examples of this are low calorie, less high alcohols, nutritional benefits, organic, hand crafted, farm to table, all natural, less sugar, probiotic, hydrating electrolytes, etc. Azoth's existing products have one or several of these attributes and following its merger with the Debtor to form KIMO, the Reorganized Debtor's new products to be introduced in 2022 will focus on better for you attributes in both the alcoholic and non-alcoholic categories.

Through these post-merger activities, Debtor projects steady annual growth in the Reorganized Debtor. **Exhibit C** includes the Reorganized Debtor's pro forma financials demonstrating the significant long-term value the Plan provides to stakeholders through the Azoth Merger.

The Plan also proposes for the Reorganized Debtor to form the wholly owned "ISH Sub" to merge with ISI, which will allow for business growth in the entheogenic and functional plant-based wellness industry. Because the Plan proposes for Debtor to merge with established, viable companies; thus, the Debtor reasonably believes that the Reorganized Debtor will be able to make all such distributions under the Plan. Therefore, the Bankruptcy Court's confirmation of the Plan is not likely to be followed by liquidation of the Debtor or the need for further reorganization.

## X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. IN GENERAL

A summary description of certain U.S. federal income tax consequences of the Plan is provided below. The description of tax consequences below is for informational purposes only and is subject to significant uncertainties. Only the principal consequences of the Plan for the Debtor and for the Holders of Claims who are entitled to vote to confirm or reject the Plan are described below. No opinion of counsel has been sought or obtained with respect to tax consequences of the Plan, and no tax opinion is being given in this Disclosure Statement. No rulings or determinations of the Internal Revenue Service ("IRS") or any other tax authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other authorities.

The following discussion of U.S. federal income tax consequences is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), regulations promulgated and proposed thereunder, and judicial decisions and administrative rulings and pronouncements of the IRS as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated in the future could alter or modify the analyses and conclusions set forth below. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences to Holders of Claims or

Equity Interests. Any such changes or interpretations may be retroactive and could significantly affect the U.S. federal income tax consequences discussed below.

THIS DISCUSSION DOES NOT ADDRESS FOREIGN, STATE OR LOCAL TAX CONSEQUENCES OF THE PLAN, NOR DOES IT PURPORT TO ADDRESS THE U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN ENTITIES, NONRESIDENT ALIEN INDIVIDUALS, PASS-THROUGH ENTITIES SUCH AS PARTNERSHIPS AND HOLDERS THROUGH SUCH PASS-THROUGH ENTITIES, S CORPORATIONS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, CERTAIN SECURITIES TRADERS, BROKER-DEALERS AND TAX-EXEMPT ORGANIZATIONS). FURTHERMORE, ESTATE AND GIFT TAX ISSUES ARE NOT ADDRESSED HEREIN AND TAX CONSEQUENCES RELATING TO THE ALTERNATIVE MINIMUM TAX ARE GENERALLY NOT DISCUSSED HEREIN.

NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

## B.    FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTOR

Generally, the discharge of a debt obligation by a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) gives rise to cancellation of debt ("COD") income, which must be included in the Debtor's income. The Debtor and Reorganized Debtor may have COD income as a result of the Plan, however, the Debtor and Reorganized Debtor, as applicable, should be able to utilize a special tax provision which excludes from income debts discharged in a chapter 11 case. If debts are discharged in a chapter 11 case, however, certain tax attributes otherwise available must be reduced by the amount of COD income that is excludable from income. Tax attributes subject to reduction generally include net operating losses and net operating loss carryovers (collectively, "NOLs"). Any NOLs would be reduced (assuming the Reorganized Debtor does not make an election pursuant to section 108(b)(5) of the Tax Code to first reduce the tax basis of the depreciable property) to the extent of the COD income exclusion. The COD income generated by the debt cancellation occurring pursuant to the Plan may eliminate available NOLs generated prior to the Effective Date (although such NOLs, which may be subject to usage limitations under section 382 of the Tax Code, would first be permitted to offset any taxable income generated in the tax year that includes the Effective Date). The Debtor's and Reorganized Debtor's remaining NOLs may have a value, and that value is presently undergoing analysis.

U.S. federal income taxes generally must be satisfied before most other claims may be paid. To the extent the Debtor or Reorganized Debtor has taxable income after the Effective Date, the Debtor may have NOLs to offset such income.

## C.    FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF CLAIMS

Holders of Claims should generally recognize a gain (or loss) to the extent the amount realized under the Plan (generally the amount of cash received) in respect of their Claims exceeds (or is exceeded by) their respective tax bases in their Claims. The tax treatment of Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan will depend upon, among other things, (a) the nature and origin of the Claim, (b) the manner in which a Holder acquired a Claim, (c) the length of time a Claim has been held, (d) whether the Claim was acquired at a discount, (e) whether the Holder has taken a bad debt deduction in the current or prior years, (f) whether the Holder has previously included in income accrued but unpaid interest with respect to a Claim, (g) the method of tax accounting of a Holder, and (h) whether a Claim is an installment obligation for U.S. federal income tax purposes. Therefore, Holders of Claims should consult their own tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to such Holders as a result thereof.

The tax treatment of a Holder of a Claim that receives distributions in different taxable years is uncertain. If such a Holder treats the transaction as closed in the taxable year it first receives (or is deemed to have received) a distribution of cash and/or other property, it should recognize gain or loss for such tax year in an amount equal to the cash and the value of the other property actually (and deemed) received in such tax year (other than that received in respect of accrued interest) with respect to its Claim (other than any portion of the Claim that is attributable to accrued interest) plus the estimated value of future distributions (if any) less its tax basis in its claim (except to the extent its Claim is for accrued interest). A Holder should then subsequently recognize additional income or loss when additional property distributions are actually received in an amount equal to the cash and/or value of such other property (other than that received in respect of accrued interest) less the Holder's allocable tax basis in its Claim with respect to such subsequent distribution. A Holder may have to treat a portion of any subsequent distribution as imputed interest recognizable as ordinary income in accordance with the Holder's method of tax accounting. If instead the open transaction doctrine applies as a result of the value of the subsequent distributions that a Holder may receive not being ascertainable on the closing date or the Effective Date, such Holder should not recognize gain (except to the extent the value of the case and/or other property already received exceeds such Holder's adjusted tax basis in its Claim (other than any Claim for accrued interest)) or loss with respect to its Claim until it receives the final distribution thereon. It is the position of the IRS that the open transaction doctrine only applies in rare and extraordinary cases. The Debtor believes that the open transaction doctrine should not apply and that Holders may be entitled to take the position that on the closing date and on the Effective Date no value should be assigned to the right to receive any subsequent distributions. Holders of Claims are urged to consult their own tax advisors regarding the application of the open transaction doctrine and how it may apply to their particular situations, whether any gain recognition may be deferred under the installment method, whether any loss may be disallowed or deferred under the related party rules and the tax treatment of amounts that certain Holders of Claims may be treated as paying to other Holders of Claims.

Holders of Allowed Claims will be treated as receiving a payment of interest (in addition to any imputed interest as discussed in the preceding paragraph) includible in income in accordance with the Holder's method of accounting for tax purposes, to the extent that any cash and/or other

property received pursuant to the Plan is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of cash and/or other property should be attributable to an accrued but unpaid interest is unclear. The Plan provides, and the Debtor intends to take the position, that such cash and/or other property distributed under the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon. Each Holder should consult its own tax advisor regarding the determination of the amount of consideration received under the Plan that is attributable to interest (if any) and whether any such interest may be considered to be foreign source income. A Holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

## D. INFORMATION REPORTING AND BACKUP WITHHOLDING

Certain payments, including the payments of Claims pursuant to the Plan, are generally subject to information reporting by the payor to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the backup withholding rules, a Holder of a Claim may be subject to backup withholding at the applicable tax rate with respect to distributions or payments made pursuant to the Plan, unless the Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury as to the correctness of its taxpayer identification number and certain other tax matters. Backup withholding is not an additional tax. Rather, the U.S. federal income tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld. If withholding results in an overpayment of U.S. federal income taxes, a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the IRS.

## E. IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE CONSEQUENCES OF THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINLY, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## XI. RECOMMENDATION AND CLOSING

The Debtor and its professional advisors have explored various alternative scenarios and they believe that the Plan enables the Holders of Claims to realize the maximum recovery under the circumstances. The Debtor believes that the Plan is in the best interest of the Estate, its Claim Holders, Equity Interest Holders, and other parties in interest and believes that the Plan will provide for a more valuable distribution to Holders of Allowed Claims and Interests than all other alternatives.

The Plan has the Debtor's support. Any alternative to confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in potentially diminished distributions to the Holders of Claims. Accordingly, the Debtor recommends the confirmation of the Plan and urges all Holders of Claims and Equity Interests to vote to accept the Plan and to indicate such acceptance by returning the Ballots so as to be received no later than the Voting Deadline.

**Exhibit A**

**Chapter 11 Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 21-32112 |
| HAWAIIAN VINTAGE CHOCOLATE | § | |
| COMPANY, INC., | § | Chapter 11 |
| | § | |
| DEBTOR. | § | |

## DEBTOR'S PREPACKAGED CHAPTER 11 PLAN

WICK PHILLIPS GOULD & MARTIN, LLP

Jason M. Rudd, Tex. Bar No. 24028786
Scott D. Lawrence, Tex. Bar No. 24087896
Catherine A. Curtis, Tex. Bar No. 24095708
3131 McKinney Ave, Suite 500
Dallas, Texas 75204
Telephone: 214-692-6200
jason.rudd@wickphillips.com
scott.lawrence@wickphillips.com
catherine.curtis@wickphillips.com

PROPOSED COUNSEL FOR DEBTOR

Dated: November 22, 2021

## <u>INTRODUCTION OF PLAN</u>

Hawaiian Vintage Chocolate Company, Inc. as debtor and debtor in possession, propose this prepackaged chapter 11 plan of reorganization (the "<u>Plan</u>") for the resolution of the outstanding Claims against, and Interests in, the Debtor. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in Article I of the Plan. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtor's history, business, assets, results of operations, and historical financial information, as well as a summary and description of the Plan and certain related matters. The Debtor is the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## TABLE OF CONTENTS

**ARTICLE I. DEFINITIONS AND INTERPRETATION** ........................................................ 1

1.1 **Definitions** ........................................................................................................ 1

1.2 **Rules of Interpretation and Construction.** ........................................................ 8

**ARTICLE II. TREATMENT OF UNCLASSIFIED CLAIMS** ........................................ 8

2.1 **Administrative Expense Claims** ........................................................................ 8

2.2 **Fee Claims.** ........................................................................................................ 9

2.3 **U.S. Trustee Fees.** ............................................................................................ 10

2.4 **Priority Tax Claims.** ........................................................................................ 10

**ARTICLE III. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS** ............... 10

**ARTICLE IV. TREATMENT OF CLAIMS AND EQUITY INTERESTS** ........................ 10

4.1 **Class 1 – Priority Non-Tax Claims.** ................................................................ 10

4.2 **Class 2 – Secured Claims.** ............................................................................... 11

4.3 **Class 3 – Lender Postpetition Claims.** ............................................................ 11

4.4 **Class 4 – General Unsecured Claims.** .............................................................. 11

4.5 **Class 5 – Equity Interests.** .............................................................................. 12

**ARTICLE V. IMPAIRMENT; ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES** ............................................ 12

5.1 **Classes Entitled to Vote.** ................................................................................. 12

5.2 **Class Acceptance Requirement.** ....................................................................... 12

5.3 **Cramdown.** ....................................................................................................... 12

5.4 **Elimination of Classes.** .................................................................................... 13

**ARTICLE VI. MEANS OF IMPLEMENTATION** .......................................................... 13

6.1 **Debtor's Merger with Azoth, Inc.** .................................................................. 13

6.2     **Debtor's Merger with Inner State, Inc.** ............................................................ **15**

6.3     **Lender Settlement.** .............................................................................................. **17**

6.4     **General Settlement of Claims.** ........................................................................... **17**

6.5     **Cancellation of Existing Securities and Agreements.** ....................................... **18**

6.6     **Restructuring Transactions.** ............................................................................. **18**

6.7     **Corporate Action.** ............................................................................................. **18**

6.8     **Vesting of Assets.** .............................................................................................. **18**

6.9     **Effectuating New Organizational Documents; Further Transactions.** ........... **19**

6.10     **Cooperation with the Reorganized Debtor.** ...................................................... **19**

6.11     **Directors and Officers of the Reorganized Debtor.** ......................................... **19**

**ARTICLE VII. DISTRIBUTIONS** ................................................................................... **19**

7.1     **Date of Distributions.** ........................................................................................ **19**

7.2     **Sources of Distribution.** ..................................................................................... **19**

7.3     **Reorganized Debtor.** .......................................................................................... **20**

7.4     **Record Date for Distributions.** ......................................................................... **20**

7.5     **Recipients of Distributions.** .............................................................................. **20**

7.6     **Delivery of Distributions and Undeliverable or Unclaimed Distributions.** .... **20**

7.7     **Means of Payment.** ............................................................................................ **21**

7.8     **Setoffs and Recoupment.** ................................................................................... **21**

7.9     **Distributions After Effective Date.** ................................................................... **21**

7.10     **Withholding and Reporting Requirements.** ...................................................... **21**

7.11     **Time Bar to Distributions.** ................................................................................ **21**

7.12     **No Fractional Distributions.** ............................................................................. **22**

7.13     **Minimum Distribution.** ...................................................................................... **22**

7.14     **SEC Exemption.** ................................................................................................. **22**

**ARTICLE VIII. PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS** ............................................................................................................ **23**

**8.1 Objections to Claims.** ......................................................................................... **23**

**8.2 No Distributions Pending Allowance.** ............................................................... **23**

**8.3 Distributions After Allowance.** .......................................................................... **23**

**8.4 Disallowance of Late Filed Claims.** ................................................................... **23**

**ARTICLE IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .................................................................................................................. **23**

**9.1 Rejection of Contracts and Leases.** ................................................................... **23**

**9.2 Inclusiveness.** ...................................................................................................... **24**

**9.3 Claims Based on Rejection of Executory Contracts or Unexpired Leases.** .... **24**

**ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN** .................................................................... **24**

**10.1 Conditions to Confirmation of Plan.** ................................................................ **24**

**10.2 Conditions to Effective Date of Plan.** ............................................................... **24**

**10.3 Waiver of Conditions Precedent.** ...................................................................... **25**

**10.4 Effect of Failure of Conditions.** ........................................................................ **25**

**10.5 Reservation of Rights.** ....................................................................................... **25**

**ARTICLE XI. EFFECT OF CONSUMMATION** ................................................ **25**

**11.1 Discharge of Claims and Interests in the Debtor.** ........................................... **25**

**11.2 Injunction against Interference with Plan.** ...................................................... **26**

**11.3 Exculpation.** ....................................................................................................... **26**

**11.4 Debtor and Estate Releases** .............................................................................. **26**

**11.5 Injunction and Stay.** .......................................................................................... **27**

**11.6 Preservation of Claims.** .................................................................................... **27**

**11.7 Compromise of Controversies.** ......................................................................... **28**

**ARTICLE XII. RETENTION OF JURISDICTION**.................................................................... 28

**ARTICLE XIII. MISCELLANEOUS**............................................................................................ 29

**13.1** **Payment of Statutory Fees.** ........................................................................................ 29

**13.2** **Filing of Additional Documents.**................................................................................. 29

**13.3** **Schedules, Exhibits and Plan Supplement Incorporated.** ........................................ 29

**13.4** **Amendment or Modification of the Plan.** .................................................................. 29

**13.5** **Inconsistency.** ............................................................................................................... 30

**13.6** **Exemption from Certain Transfer Taxes.** .................................................................. 30

**13.7** **Expedited Tax Determination.**.................................................................................... 30

**13.8** **Binding Effect.**.............................................................................................................. 30

**13.9** **Severability.** .................................................................................................................. 30

**13.10** **No Payment of Attorneys' Fees.** ................................................................................. 31

**13.11** **Notices.** .......................................................................................................................... 31

**13.12** **Governing Law.**............................................................................................................. 31

Debtor Hawaiian Vintage Chocolate Company, Inc. proposes the following Prepackaged Chapter 11 Plan of Reorganization pursuant to section 1121(a) of the Bankruptcy Code.

## ARTICLE I. DEFINITIONS AND INTERPRETATION

### 1.1    Definitions

For the purpose of this Plan, the following terms shall have the respective meanings set forth below:

*Action* means any claim, action, cause of action, demand, lawsuit, arbitration, notice of violation, proceeding, litigation, citation, or summons, whether civil, criminal, administrative, regulatory, or otherwise, whether at law or in equity.

*Administrative Expense Claim* means any right to payment constituting a cost or expense of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b) or 507 of the Bankruptcy Code, including, without limitation, (i) any fees or charges assessed against the Estate under 28 U.S.C. § 1930, (ii) Fee Claims, and (iii) other Administrative Expense Claims as may be ordered and Allowed by the Bankruptcy Court.

*Allowed* means, with reference to any Claim or Equity Interest, (i) for which a proof of claim or proof of interest has been filed and as to which no objection has been interposed on or before the Objection Deadline or such other applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, (ii) which appears in the Debtor's Schedules and is not listed as contingent, liquidated or disputed, or if the Schedules are not filed, then appears in the Debtor's books and records as a valid Claim or Equity Interest, (iii) which is allowed by Final Order of the Bankruptcy Court, or (iv) which is expressly allowed under this Plan.

*Avoidance Actions* means Actions arising under sections 502, 510, 541, 542, 543, 544, 545, 547 through and including 553 of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation is commenced to prosecute such Actions, and which may be recovered pursuant to section 550 of the Bankruptcy Code.

*Azoth* or *Azoth, Inc.* means Azoth, Inc., a Delaware corporation.

*Azoth Shareholders* means the holders of shares, equity securities, equity interests, or ownership interests in Azoth Inc. as of the Petition Date.

*Ballot* means the ballot provided to holders of Claims or Equity Interests to indicate their votes to accept or reject the Plan.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time.

*Bankruptcy Court* means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court of the United States having jurisdiction over the Chapter 11 Case.

***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended and in effect from time to time.

***Bar Date*** means the last date to file proofs of claim or interest against the Debtor.

***Business Day*** means any day other than a Saturday, Sunday, or "legal holiday" as defined in Bankruptcy Rule 9006(a).

***Cash*** means legal tender of the United States of America.

***Chapter 11 Case*** means the above-captioned chapter 11 bankruptcy case.

***Claim*** means a claim against the Debtor or the Estate within the meaning of section 101(5) of the Bankruptcy Code.

***Class*** means any group of Claims or Equity Interests classified by this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

***Collateral*** means any property or interest in property of the Estate subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state or federal law.

***Confirmation Date*** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

***Confirmation Hearing*** means the hearing conducted by the Bankruptcy Court pursuant to sections 1128(a) and 1129 of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

***Confirmation Order*** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

***Credit Agreements*** means those certain (1) Secured Superpriority Debtor-in-Possession Promissory Note by and between the Debtor and the Lender, (2) any other postpetition financing agreements between the Debtor and the Lender.

***Debtor*** means Hawaiian Vintage Chocolate Company, Inc., in its capacity as chapter 11 debtor.

***Disallowed Claim or Equity Interest*** means any Claim or Equity Interest, or portion thereof that is not an Allowed Claim, an Allowed Equity Interest, or a Disputed Claim or Disputed Equity Interest.

***Disclosure Statement*** means that certain disclosure statement relating to the Plan, including all exhibits and schedules thereto, as the same may be amended, supplemented, or otherwise modified from time to time.

***Disputed Claim or Equity Interest*** means, with respect to a Claim or Equity Interest, such Claim or Equity Interest (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under section 502, 503 or 1111 of the Bankruptcy Code, or (b) with respect to which the Debtor or Reorganized Debtor or any party in interest has interposed a timely objection (as a contested matter, adversary proceeding, or otherwise) or request for estimation prior to the Objection Deadline in accordance with the Plan or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order as of the Effective Date.

***Distribution Date*** means the date, occurring on or as soon as practicable after the Effective Date, on which the Reorganized Debtor first makes distributions to holders of Allowed Claims and Allowed Equity Interests as provided in the Plan.

***Distribution Record Date*** means the record date for purposes of receiving distributions under the Plan on account of Allowed Claims and Allowed Equity Interests, which shall be November 22, 2021.

***Effective Date*** means the first Business Day on which all the conditions precedent to the effectiveness of the Plan specified in Section 10.2 hereof shall have been satisfied or waived as provided in Section 10.3 hereof; *provided*, *however*, that if a stay, injunction or similar prohibition of the Confirmation Order is in effect, the Effective Date shall be the first Business Day after such stay, injunction or similar prohibition is no longer in effect.

***Entity*** has the meaning set forth in section 101(15) of the Bankruptcy Code.

***Equity Interest*** means any "equity security" of the Debtor, as that term is defined in section 101(16) of the Bankruptcy Code.

***Estate*** means the Debtor's estate as created under section 541 of the Bankruptcy Code.

***Exculpated Parties*** means the Debtor, the Reorganized Debtor, Wick Phillips Gould & Martin, LLP, and the Lender.

***Fee Claim*** means any Claim by a Professional Person under sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and/or reimbursement of expenses in the Chapter 11 Case.

***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari*, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, *certiorari* shall have been denied or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for *certiorari*, or move for a stay, new trial, reargument or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the

possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

***General Unsecured Claim*** means any Claim against the Debtor that is not an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, a DIP Lender Claim, or an Equity Interest. General Unsecured Claim includes any unsecured claim held by the holder of an Other Secured Claim as a result of the operation of section 506(a)(1) of the Bankruptcy Code.

***Governmental Unit*** has the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

***Holder*** means an Entity holding a Claim or an Interest, as applicable. "Hold" and "Held" shall have the correlative meanings.

***Impaired*** means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

***Insider*** means any Person who is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code, or who may otherwise be determined to be an "insider" under section 101(31) of the Bankruptcy Code by a court of competent jurisdiction.

***Interest*** means any equity security (as defined in section 101(16) of the Bankruptcy Code) in Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest.

***ISH*** means Inner State Health, Inc., a successor to the Debtor incorporated as a Delaware corporation on the Effective Date from the merger of Inner State, Inc. and a newly formed subsidiary of the Reorganized Debtor.

***ISH Class A Common Stock*** means the New Common Stock in ISH for which the holder of each share is entitled to ten (10) votes on account of that share in any shareholder vote.

***ISH Class B Common Stock*** means the New Common Stock in ISH for which the holder of each share is entitled to one (1) vote on account of that share in any shareholder vote.

***ISH Six Month Warrant*** means a warrant to purchase a share of ISH Class B Common Stock at an exercise price of $6.00 per share, expiring on the date that is six (6) months after the Effective Date.

***ISH Twelve Month Warrant*** means a warrant to purchase a share of ISH Class B Common Stock at an exercise price of $9.00 per share, expiring on the date that is twelve (12) months after the Effective Date.

***ISH Twenty-Four Month Warrant*** means a warrant to purchase a share of ISH Class B Common Stock at an exercise price of $15.00 per share, expiring that date that is twenty-four (24) months after the Effective Date.

***ISI Warrants*** means, together, the ISI Six Month Warrants, the ISI Twelve Month Warrants and the ISI Twenty-Four Month Warrants.

***ISI*** means Inner State, Inc., a Delaware Corporation.

***KIMO*** and ***KIMO, Inc.*** means KIMO, Inc., the Reorganized Debtor as reincorporated in Delaware and renamed on the Effective Date, a successor to the Debtor under the Plan.

***KIMO Class A Common Stock*** means the New Common Stock in the Reorganized Debtor for which the holder of each share is entitled to ten (10) votes on account of that share in any shareholder vote.

***KIMO Class B Common Stock*** means the New Common Stock in the Reorganized Debtor for which the holder of each share is entitled to one (1) vote on account of that share in any shareholder vote.

***KIMO Six Month Warrant*** means a warrant to purchase a share of Kimo Class B Common Stock at an exercise price of $10.00 per share, expiring on the date that is six (6) months after the Effective Date.

***KIMO Twelve Month Warrant*** means a warrant to purchase a share of Kimo Class B Common Stock at an exercise price of $15.00 per share, expiring on the date that is twelve (12) months after the Effective Date.

***KIMO Twenty-Four Month Warrant*** means a warrant to purchase a share of Kimo Class B Common Stock at an exercise price of $20.00 per share, expiring that date that is twenty-four (24) months after the Effective Date.

***KIMO Warrants*** means, together, the KIMO Six Month Warrants, the KIMO Twelve Month Warrants and the KIMO Twenty-Four Month Warrants.

***Lender*** means Allison Investment Corporation, in its capacity as prepetition and postpetition lender to the Debtor.

***Lender Note*** means loan proceeds of up to $150,000.00, funded to the Reorganized Debtor after entry of the DIP Order pursuant to the Secured Superpriority Debtor-in-Possession Promissory Note.

***Lender Postpetition Claim*** means a Claim held by the Lender resulting from the Lender's loans under the Postpetition Financing Orders and the Credit Agreements.

***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Local Rules* means the Bankruptcy Local Rules of the United States Bankruptcy Court for the Northern District of Texas, as the same may be amended or modified from time to time.

*New Common Stock* means the new common stock in Reorganized Debtor and any of its subsidiaries whether issued or unissued on the Effective Date, including those shares to be distributed under and in accordance with the Plan.

*New Organizational Documents* means such certificates or articles of incorporation, bylaws, limited liability company operating agreements, stockholders' agreements, or other applicable formation and governance documents of the Reorganized Debtor, the Target Subs and the ISH Sub.

*Non-Insider* means a Person who is not an Insider.

*Objection Deadline* means the later of (a) one hundred twenty (120) days after the Effective Date and (b) such later as may be ordered by the Bankruptcy Court prior to the expiration of such one hundred twenty (120) day period, upon motion.

*Petition Date* means the date the Debtor filed this Chapter 11 Case, expected to be November 29, 2021, or as soon as practicable.

*Person* means an individual, partnership, corporation, limited liability company, cooperative, trust, unincorporated organization, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

*Plan* means this Chapter 11 Plan, as the same may be amended, supplemented or otherwise modified from time to time, including any exhibits and schedules hereto.

*Postpetition Financing Orders* means orders entered by the Bankruptcy Court approving postpetition financing for the Debtor from the Lender.

*Priority Non-Tax Claim* means any Claim that is entitled to priority in payment pursuant to sections 507(a)(4), (5), (6) or (7) of the Bankruptcy Code and that is not an Administrative Expense Claim or a Priority Tax Claim.

*Priority Tax Claim* means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Professional Fee Escrow* means all funds the Lender paid to the Debtor to fund the payment of the Debtor's Professional Persons' fees and expenses pursuant to the terms of the Postpetition Financing Orders.

*Professional Person* means any Person retained or to be compensated by the Debtor pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

*Pro Rata* means the proportion that the amount of an Allowed Claim or Allowed Equity Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Allowed Equity Interests in such Class.

*Released Parties* means, collectively, the Lender and its predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, shareholders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees.

*Releasing Parties* means the Debtor, the Reorganized Debtor, and the Estate on behalf of themselves and their respective successors, assigns, and representatives and any and all other entities that may purport to assert any cause of action derivatively, by or through the foregoing entities, as defined in Section 11.4.

*Reorganized Debtor* means KIMO, Inc., as reorganized pursuant to and under the Plan or any successor thereto, as set forth in the Plan and the New Organizational Documents following the Effective Date of this Plan.

*Reorganized Board* means the board of directors of Reorganized Debtor on and after the Effective Date.

*Restructuring Transactions* means those amalgamations, consolidations, arrangements, continuances, restructurings, transfers, sales, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtor reasonably determines to be necessary or desirable to merge with Azoth, Inc. and form subsidiaries to further merge with Inner State, Inc., including, without limitation, the transactions contemplated by the New Organizational Documents.

*Schedules* means, collectively, Schedules A through H and the Statement of Financial Affairs, as filed by the Debtor in the Chapter 11 Case, as the same may have been or may be amended from time to time.

*SEC* means the Securities and Exchange Commission.

*Secured Claim* means a Claim secured by a Lien that is valid, perfected and enforceable, and not avoidable, upon property in which the Debtor has an interest, to the extent of the value, as of the Effective Date, of such interest or Lien as determined by a Final Order of the Bankruptcy Court pursuant to section 506 of the Bankruptcy Code, or as otherwise agreed to in writing by the Debtor and the holder of such Claim.

*Securities Act* means the Securities Act of 1933, 15 U.S.C. §§ 77–77a, as amended, together with the rules and regulations promulgated thereunder.

*Security* or *Securities* has the meaning set forth in section 2(a)(1) of the Securities Act.

*Subordinated Claim* means any Claim or Equity Interest that is subject to (a) subordination under section 510 of the Bankruptcy Code or any other statute, (b) contractual subordination, (c) equitable subordination as determined by the Bankruptcy Court in a Final Order, including, without limitation, any Claim or Equity Interest (i) for or arising from the rescission of a purchase, sale, issuance, or offer of a Security of the Debtor; (ii) for damages arising from the purchase or sale of such a Security; or (iii) for reimbursement, indemnification, or contribution allowed under

section 502 of the Bankruptcy Code on account of such Claim or Equity Interest, (d) a Claim or Equity Interest that is subordinated by agreement of the holder, or (e) any Claim or Equity Interest acquired by a holder of a Claim or Equity Interest that is subordinated under this Plan.

*U.S. Trustee* means the Office of the U.S. Trustee Region 6 for the Northern District of Texas*.*

*Unimpaired* means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

*Voting Deadline* means the date set by the Bankruptcy Court by which Ballots for accepting or rejecting the Plan must be received.

## 1.2 Rules of Interpretation and Construction.

(a) <u>Interpretation</u>. Unless otherwise specified herein, all section, article, and exhibit references in the Plan are to the respective section in, article of, and exhibit to, the Plan, as the same may be amended, waived or modified from time to time. All headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

(b) <u>Construction and Application of Bankruptcy Code Definitions</u>. Unless otherwise defined herein, words and terms defined in section 101 of the Bankruptcy Code shall have the same meanings when used in the Plan. Words or terms used but not defined herein shall have the meanings ascribed to such terms or words, if any, in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.

(c) <u>Other Terms</u>. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular article, section, subsection, or clause contained in the Plan.

(d) <u>Time</u>. In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II. TREATMENT OF UNCLASSIFIED CLAIMS

## 2.1 Administrative Expense Claims.

All Administrative Expense Claims against the Estate, other than Fee Claims, shall be treated as follows:

(a) <u>Time for Filing</u>. All holders of Administrative Expense Claims, other than Professional Persons holding Fee Claims, shall file with the Bankruptcy Court a request for payment of such Claims within thirty (30) days after the Effective Date. Any such request must be served on the Reorganized Debtor and its counsel, and must, at a minimum, set forth (i) the name of the holder of the Administrative Expense Claim; (ii) the amount of the Administrative Expense Claim; and (iii) the

basis for the Administrative Expense Claim. A failure to file any such request in a timely fashion will result in the Administrative Expense Claim in question being discharged and its holder forever barred from asserting such Administrative Expense Claim against the Estate or any other Person.

(b)     <u>Allowance</u>. An Administrative Expense Claim for which a request for payment has been properly filed shall become an Allowed Administrative Expense Claim unless an objection is filed by the date that is twenty-one (21) days after a request for payment of such Administrative Expense Claim is filed. If an objection is timely filed, the Administrative Expense Claim in question shall become an Allowed Administrative Expense Claim only to the extent so Allowed by Final Order of the Bankruptcy Court.

(c)     <u>Payment</u>. Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment of such Claim, each holder of an Allowed Administrative Expense Claim shall receive, on account of and in full satisfaction of such Claim, Cash in an amount equal to the Allowed amount of such Administrative Expense Claim on (or as soon as reasonably practicable after) the later of (A) the Effective Date or (B) ten (10) days after entry of an order by the Bankruptcy Court allowing such Administrative Expense Claim. The Debtor or Reorganized Debtor, as applicable, shall pay Allowed Administrative Expense Claims from cash on hand or as otherwise agreed by the holder of the Allowed Fee Claim and the Debtor or the Reorganized Debtor, as applicable.

(d)     <u>Lender Exception</u>. Lender is excepted from the obligations of this Section 2.1. The terms of this Section 2.1 shall not apply to Lender. The Lender Postpetition Claim Lender holds is deemed to be an Allowed Administrative Expense Claim pursuant to the terms of the Postpetition Financing Order. Lender has agreed to the treatment of its Allowed Administrative Expense Claim as described in Section 4.2 of this Plan.

**2.2     Fee Claims.**

Every Professional Person holding a Fee Claim that has not previously been the subject of a final fee application and accompanying Bankruptcy Court order approving the same shall file a final application for payment of fees and reimbursement of expenses no later than the date that is thirty (30) days after the Effective Date. Any such final fee application shall conform to and comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. Allowed Fee Claims subject to the Professional Fee Escrow shall be paid by the Debtor from the Professional Fee Escrow pursuant to the terms of the Postpetition Financing Order. To the extent an Allowed Fee Claims is not covered by the Professional Fee Escrow, then such Allowed Fee Claims shall be paid by the Debtor or Reorganized Debtor, as applicable, in Cash within ten (10) days of enter of the order Allowing the Fee Claim.

**2.3     U.S. Trustee Fees.**

All fees payable under section 1930 of title 28 of the United States Code shall be paid on or before the Effective Date. All such fees that arise after the Effective Date but before the closing of the Chapter 11 Case shall be paid by the Reorganized Debtor.

**2.4     Priority Tax Claims.**

Except to the extent that a holder of an Allowed Priority Tax Claim has agreed or agrees to a different treatment of such Claim, each holder of an Allowed Priority Tax Claim shall receive on (or as soon as reasonably practicable after) the Effective Date, Cash in an amount equal to the Allowed amount of such Claim. To the extent the holder of an Allowed Priority Tax Claim has a Lien on Estate property, such Lien shall remain in place until such Allowed Priority Tax Claim has been paid in full.

## ARTICLE III. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

All Claims against, and Equity Interests in, the Debtor are classified for all purposes, including voting, confirmation, and distribution, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | No | No (deemed to accept) |
| Class 2 | Secured Claims | Yes | Yes |
| Class 3 | Lender Postpetition Claims | Yes | Yes |
| Class 4 | General Unsecured Claims | Yes | Yes |
| Class 5 | Equity Interests | Yes | Yes |

Administrative Expense Claims and Priority Tax Claims, other than the Lender Postpetition Claim, are not classified for purposes of voting or receiving distributions under the Plan, pursuant to section 1123(a)(1) of the Bankruptcy Code. Instead, all such Claims shall be treated separately as unclassified claims on the terms previously set forth in Article II of this Plan.

## ARTICLE IV. TREATMENT OF CLAIMS AND EQUITY INTERESTS

**4.1     Class 1 – Priority Non-Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against the Estate agrees to a less favorable treatment, each such Holder shall receive, in full satisfaction of such Claim, payment in full in by the Debtor or Reorganized Debtor, as applicable, on (or as soon as reasonably practicable after) the later of (A) the Effective Date or (B) ten (10) days after such Priority Non-Tax Claim becomes Allowed. Holders of Priority Non-Tax Claims are unimpaired, deemed to accept the Plan, and not entitled to vote thereon. The Debtor believes that, as of the Effective Date, there will be no claims in Class 1.

4.2     **Class 2 – Secured Claims.**

On the Effective Date (or as soon as reasonably practicable thereafter), except to the extent that a Holder of an Allowed Secured Claim against the Estate agrees to less favorable treatment, each Holder of an Allowed Secured Claim shall, at the Debtor's option, receive one of the following treatments: (i) the Collateral securing such Allowed Secured Claim; or (ii) Cash distributions from the Reorganized Debtor totaling the amount of the Allowed Secured Claim, paid in five equal annual installments, plus interest at 6% per annum, secured by the Collateral securing such Allowed Secured Claim. Holders of secured claims are Impaired under the Plan and may vote. The Debtor believes that, as of the Effective Date, there will be no claims in Class 2.

4.3     **Class 3 – Lender Postpetition Claims.**

Except to the extent that the Holder of the Allowed Lender Postpetition Claim against the Estate agrees to a different treatment, the Holder of an Allowed Lender Postpetition Claim shall receive the following, in full satisfaction of such Claim:

| | Description | Amount |
|---|---|---|
| 1. | KIMO Class B Common Stock | 40,388 |
| 2. | KIMO Six Month Warrants | 8,000 |
| 3. | KIMO Twelve Month Warrants | 12,000 |
| 4. | KIMO Twenty-Four Month Warrants | 12,000 |
| 5. | ISH Class B Common Stock | 15,000 |
| 6. | ISH Six Month Warrants | 8,000 |
| 7. | ISH Twelve Month Warrants | 8,000 |
| 8. | ISH Twenty-Four Month Warrants | 8,000 |

Lender Postpetition Claims are Impaired under the Plan. Holders of Lender Postpetition Claims may vote.

4.4     **Class 4 – General Unsecured Claims.**

Except to the extent that a Holder of an Allowed General Unsecured Claim against the Estate agrees to a different treatment, each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction of such Claim, a Pro Rata share of the following:

| | Description | Amount |
|---|---|---|
| 1. | KIMO Class B Common Stock | 100,969 |
| 2. | KIMO Six Month Warrants | 20,000 |
| 3. | KIMO Twelve Month Warrants | 30,000 |
| 4. | KIMO Twenty-Four Month Warrants | 30,000 |
| 5. | ISH Class B Common Stock | 37,500 |
| 6. | ISH Six Month Warrants | 20,000 |
| 7. | ISH Twelve Month Warrants | 20,000 |
| 8. | ISH Twenty-Four Month Warrants | 20,000 |

General Unsecured Claims are Impaired under the Plan. Holders of General Unsecured Claims may vote.

### 4.5 Class 5 – Equity Interests.

Except to the extent that a Holder of an Allowed Equity Interest in the Debtor agrees to a different treatment, all Equity Interests in the Debtor shall be canceled as the Effective Date and each Holder of an Allowed Equity Interest shall receive, in full satisfaction of and replacement of their Allowed Equity Interest, a Pro Rata share of the following:

| | Description | Amount |
|---|---|---|
| 1. | KIMO Class B Common Stock | 868,336 |
| 2. | KIMO Six Month Warrants | 172,000 |
| 3. | KIMO Twelve Month Warrants | 258,000 |
| 4. | KIMO Twenty-Four Month Warrants | 258,000 |
| 5. | ISH Class B Common Stock | 322,500 |
| 6. | ISH Six Month Warrants | 172,000 |
| 7. | ISH Twelve Month Warrants | 172,000 |
| 8. | ISH Twenty-Four Month Warrants | 172,000 |

The Debtor estimates that a Holder of Allowed Equity Interests will receive approximately five (5) shares of KIMO Class B Common Stock, one (1) KIMO Twelve Month Warrant, and two (2) KIMO Twelve Month Warrants and KIMO Twenty-Four Month Warrants for every 100 shares of the Debtor's common stock the Holder owned on the Petition Date under the Plan. Equity Interests are Impaired under the Plan. Holders of Equity Interests may vote.

## ARTICLE V. IMPAIRMENT; ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES

### 5.1 Classes Entitled to Vote.

The holders of Claims in Class 1 are unimpaired, conclusively deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. The holders of claims in Classes 2, 3, 4, and 5 are impaired and entitled to vote to accept or reject the Plan.

### 5.2 Class Acceptance Requirement.

A Class of impaired Claims shall have accepted the Plan if the holders of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Claims in such Class who have voted on the Plan have voted to accept the Plan. A Class of impaired Equity Interests shall have accepted the Plan if at least two-thirds (2/3) in amount of Equity Interests in such Class who have voted on the Plan have voted to accept the Plan.

### 5.3 Cramdown.

To the extent that any Class is impaired under the Plan and such Class fails to accept the Plan in accordance with section 1126(c) or (d) of the Bankruptcy Code, the Debtor hereby requests

that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.

**5.4    Elimination of Classes.**

Any Class that does not contain any Allowed Claims or any Claims temporarily Allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed not included in this Plan for purposes of (i) voting to accept or reject this Plan and (ii) determining whether such Class has accepted or rejected this Plan under section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE VI. MEANS OF IMPLEMENTATION

**6.1    Debtor's Merger with Azoth, Inc.**

(a)    On the Effective Date, the Debtor shall merge with Azoth, Inc. and the resulting merged Reorganized Debtor shall be renamed "KIMO, Inc." and will be incorporated in Delaware. The Debtor is authorized to enter into an agreement of merger (as may be amended, revised or supplemented) with Azoth, Inc. and any related agreements or filings without the need for any further corporate or organizational action and without further action by or approval of the Bankruptcy Court. KIMO, Inc. shall be deemed a "successor" to the Debtor and "affiliate" of the Debtor under Section 1145 of the Bankruptcy Code.

(b)    As a result of the Azoth Merger, the Reorganized Debtor will own and operate the following wholly owned subsidiaries:

(i)    DWLL LLC ("DWLL Sub"),

(ii)    Surf City Still Works LLC ("Surf City Sub"), and

(iii)    Kimo Sabe S.A.P.I. de CV ("Kimo Sabe Sub", together with the DWLL Sub and the Surf City Sub, the "Target Subs").

(c)    The Reorganized Debtor is authorized to create and issue up to 100,000,000 shares of New Common Stock in KIMO, including KIMO Class A Common Stock, KIMO Class B Common Stock, for distribution and reserve (together, the "KIMO Common Stock").

(d)    The Reorganized Debtor is authorized to issue and distribute from the KIMO Common Stock the following:

| Recipients | | Amount |
|---|---|---|
| **KIMO Class B Common Stock** | | **17,182,316** |
| | Class 3 Creditors | 40,388 |
| | Class 4 Creditors | 100,969 |
| | Class 5 Equity Interests | 868,336 |
| | Azoth, Inc. Shareholders | 12,172,623 |

| | | |
|---|---|---:|
| | Reserve (includes Warrants) | 6,009,698 |
| **KIMO Class A Common Stock** | | **12,060,000** |
| | Azoth, Inc. Shareholders | 12,060,000 |
| | Reserve (includes Warrants) | n/a |
| **KIMO Six Month Warrants** | | **200,000** |
| | Class 3 Creditors | 8,000 |
| | Class 4 Creditors | 20,000 |
| | Class 5 Equity Interests | 172,000 |
| | Azoth, Inc. Shareholders | - |
| | Reserve (includes Warrants) | n/a |
| **KIMO Twelve Month Warrants** | | **300,000** |
| | Class 3 Creditors | 12,000 |
| | Class 4 Creditors | 30,000 |
| | Class 5 Equity Interests | 258,000 |
| | Azoth, Inc. Shareholders | - |
| | Reserve (includes Warrants) | n/a |
| **KIMO Twenty-Four Month Warrants** | | **300,000** |
| | Class 3 Creditors | 12,000 |
| | Class 4 Creditors | 30,000 |
| | Class 5 Equity Interests | 258,000 |
| | Azoth, Inc. Shareholders | - |
| | Reserve (includes Warrants) | n/a |

(e)     The Reorganized Debtor shall not be required to distribute "odd lot" or fractional KIMO Common Shares or KIMO Warrants and may round up all distributions to the next whole number.

(f)     All KIMO Common Stock created, issued or reserved pursuant to the Plan, including all KIMO Common Stock issued upon exercise of KIMO Warrants, shall have no par value and each share of KIMO Common Stock shall rank equally in rights, dividends and returns, except as to voting power. KIMO Common Stock shall bear the following legend:

> The securities represented by this certificate have not been registered under the Securities Act of 1933 and were issued pursuant to an exemption provided by 11 U.S.C. Section 1145, under an order confirming a chapter 11 plan in a case entitled *In re Hawaiian Vintage Chocolate Company, Inc*. 21-[•] in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. The holder of this certificate is referred to 11 U.S.C. Section 1145 (b) and (c) for guidance to the sales of these securities.

(g)     All KIMO Common Stock shall be free trading for the purposes of public or private sales, to the extend allowed by Section 1145 of the Bankruptcy Code and applicable law. Further, recipients of the stock and warrants under the Plan shall not be deemed underwriters, controlling person, or affiliates of the issuer, in

connection with their resale or other disposition or liquidation, except as required by applicable law. Notwithstanding the information provided in the Disclosure Statement regarding the value of the respective issuers, the value of the KIMO Common Stock and KIMO Warrants to be distributed in connection with the Plan should be considered speculative.

(h)     Confirmation shall be deemed approval of the agreement of merger (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtor or the Reorganized Debtor in connection therewith), to the extent not approved by the Bankruptcy Court previously, and the Reorganized Debtor is authorized to execute and deliver those documents necessary or appropriate to effectuate the terms of the agreement of merger, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtor may deem to be necessary to consummate the agreement of merger.

## 6.2     Debtor's Merger with Inner State, Inc.

(a)     On the Effective Date, the Reorganized Debtor shall incorporate Inner State Health, Inc. as Delaware corporation as a wholly owned subsidiary of the Reorganized Debtor. The Reorganized Debtor is authorized to merge ISH with Inner State, Inc. (the "ISI Merger"). The resulting merged subsidiary of the Reorganized Debtor shall be named "Inner State Health, Inc.". The Reorganized Debtor and ISH are authorized to enter into the agreement of merger (as may be amended, revised or supplemented) with ISI and any related agreements or filings without the need for any further corporate or organizational action and without further action by or approval of the Bankruptcy Court. Inner State Health, Inc. shall be deemed a "successor" to the Debtor and "affiliate" of the Debtor under Section 1145 of the Bankruptcy Code.

(b)     As a result of the ISI Merger, the Reorganized Debtor will own ISH and is authorized on the Effective Date to create and issue up to 75,000,000 shares of New Common Stock in ISH, including 8,000,000 shares of ISH Class A Common Stock, 16,000,000 shares of ISH Class B Common Stock, for distribution and reserve (together, the "ISH Common Stock"). Through the issuance of the ISH Common Stock, the Reorganized Debtor will spin-off ISH, making the ISH Common Stock separately traded from the KIMO Stock.

(c)     The Reorganized Debtor is authorized to issue and distribute from the ISH Common Stock the following:

| Recipients | Amount |
|---|---|
| **ISH Class B Common Stock** | **16,000,000** |
| Class 3 Creditors | 15,000 |
| Class 4 Creditors | 37,500 |

| | Class 5 Equity Interests | 322,500 |
| | ISI Shareholders | 1,598,000 |
| | Reserve (includes Warrants) | 14,027,000 |
| **ISH Class A Common Stock** | | **8,000,000** |
| | ISI Shareholders | 8,000,000 |
| | Reserve | n/a |
| **ISH Six Month Warrants** | | **200,000** |
| | Class 3 Creditors | 8,000 |
| | Class 4 Creditors | 20,000 |
| | Class 5 Equity Interests | 172,000 |
| | ISI Shareholders | - |
| | Reserve | n/a |
| **ISH Twelve Month Warrants** | | **200,000** |
| | Class 3 Creditors | 8,000 |
| | Class 4 Creditors | 20,000 |
| | Class 5 Equity Interests | 172,000 |
| | ISI Shareholders | - |
| | Reserve | n/a |
| **ISH Twenty-Four Month Warrants** | | **200,000** |
| | Class 3 Creditors | 8,000 |
| | Class 4 Creditors | 20,000 |
| | Class 5 Equity Interests | 172,000 |
| | ISI Shareholders | - |
| | Reserve | n/a |

(d)    The Reorganized Debtor shall not be required to distribute "odd lot" or fractional ISH Common Shares or ISH Warrants and may round up all distributions to the next whole number.

(e)    All ISH Common Stock created, issued or reserved pursuant to the Plan, including all ISH Common Stock issued upon exercise of ISH Warrants shall have no par value and each share of ISH Common Stock shall rank equally in rights, dividends and returns, except as to voting power. ISH Common Stock shall bear the following legend:

> The securities represented by this certificate have not been registered under the Securities Act of 1933 and were issued pursuant to an exemption provided by 11 U.S.C. Section 1145, under an order confirming a chapter 11 plan in a case entitled *In re Hawaiian Vintage Chocolate Company, Inc*. 21-[•] in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. The holder of this certificate is referred to 11 U.S.C. Section 1145 (b) and (c) for guidance to the sales of these securities.

(f)    All ISH Common Stock shall be free-trading for the purposes of public or private sales, to the extend allowed by Section 1145 of the Bankruptcy Code and

applicable law. Further, recipients of the stock and warrants under the Plan shall not be deemed underwriters, controlling person, or affiliates of the issuer, in connection with their resale or other disposition or liquidation, except as required by applicable law. Notwithstanding the information provided in the Disclosure Statement regarding the value of the respective issuers, the value of the ISH Common Stock and ISH Warrants to be distributed in connection with the Plan should be considered speculative.

(g)     Confirmation shall be deemed approval of the agreement of merger (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtor or the Reorganized Debtor in connection therewith), to the extent not approved by the Bankruptcy Court previously, and the Reorganized Debtor is authorized to execute and deliver those documents necessary or appropriate to effectuate the terms of the agreement of merger, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Reorganized Debtor may deem to be necessary to consummate the agreement of merger.

### 6.3     Lender Settlement.

This Plan constitutes a settlement under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code between the Releasing Parties on the one hand and the Released Parties on the other hand in complete and final resolution of all claims the Releasing Parties may have against the Released Parties (the "Lender Settlement"). In consideration for: (i) the Lender's provision of financing pursuant to the Credit Agreements and the Postpetition Financing Order, (ii) the Lender's agreement to provide the Lender Note, and (iii) the Lender's agreement to satisfaction of the Lender Note in exchange for New Common Stock, the Debtor proposes to waive, release, and agree not to sue Lender upon any claim or cause of action based on: (a) avoidance and recovery of the value of any transaction between the Debtor or any of its affiliates and the Lender (b) the Lender's proposals to provide and provision of prepetition and postpetition financing; (c) any of the Lender's acts or omissions related to the Debtor, the Chapter 11 Case or any Claim; and (d) any and all claims and causes of action in existence as of the Effective Date, whether known or unknown, in existence or not in existence, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, held by the Releasing Parties against the Released Parties.

### 6.4     General Settlement of Claims.

The Plan constitutes and evidences a compromise and settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. In consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan.

**6.5    Cancellation of Existing Securities and Agreements.**

Except as otherwise provided in the Plan, on and after the Effective Date, all notes, instruments, certificates, agreements, indentures, mortgages, security documents, and other documents evidencing Claims or Interests in Debtor, shall be deemed canceled, surrendered, and discharged without any need for further action or approval of the Bankruptcy Court or any Holder or other person and the obligations of the Debtor or Reorganized Debtor, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and discharged.

**6.6    Restructuring Transactions.**

On the Effective Date, the Debtor will effectuate the Restructuring Transactions, and will take any actions as may be necessary or advisable to effect a corporate restructuring as provided in the Plan. The actions to implement the Restructuring Transactions may include, as applicable, and without limitation: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, if applicable, the formation of any entity or entities that will constitute, in whole or in part, the Reorganized Debtor; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other organizational documents pursuant to applicable state law; (4) the execution and delivery of the New Organizational Documents; (5) the issuance of the New Common Stock as set forth in the Plan; and (6) all other actions that the applicable Entities determine to be necessary or advisable, including making filings or recordings that may be required by law in connection with the Plan.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

**6.7    Corporate Action.**

Upon the Effective Date, all actions contemplated under the Plan and in the New Organizational Documents shall be deemed authorized and approved in all respects.

**6.8    Vesting of Assets.**

Except as otherwise provided in the Plan, on the Effective Date, the Estate's assets shall automatically transfer to and vest in the Reorganized Debtor free and clear of all Liens, Claims, charges, or other encumbrances.

**6.9 Effectuating New Organizational Documents; Further Transactions.**

On and after the Effective Date, the Debtor is authorized to and may issue, execute, deliver, file, or record such New Organizational Documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtor, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

**6.10 Cooperation with the Reorganized Debtor.**

All Holders of Claims or Equity Interests, the Reorganized Debtor, the Lender, and any owner or assignee of the Property shall fully cooperate with the Reorganized Debtor with objections to any Claims or Equity Interests. The Bankruptcy Court retains jurisdiction to order appropriate relief under this Plan provision.

**6.11 Directors and Officers of the Reorganized Debtor.**

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtor disclosed the identity and affiliations of each person proposed to be an officer or to serve on the initial board of directors of any of the Reorganized Debtor. To the extent any such director or officer of the Reorganized Debtor is an "insider" under the Bankruptcy Code, the Debtor also will disclose the nature of any compensation to be paid to such director or officer. Each such director or officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents. As of the Effective Date, the initial Reorganized Board shall consist of the following six directors: (1) James Walsh, Chairman of the Board and CEO, (2) Tom Smith, (3) Ashley Kvamme, (4) Ed Parker, (5) Bruce Culver, and (6) Josh Kornoff. James Walsh is the only Insider of the Debtor that will serve on the Board and as the CEO of the Reorganized Debtor and will have a salary of $1.00. As of the Effective Date, the terms of the current members of the boards of directors or managers, as applicable, of the Debtor shall expire. After the Effective Date, the officers of the Reorganized Debtor shall be appointed in accordance with the respective New Organizational Documents.

## ARTICLE VII. DISTRIBUTIONS

**7.1 Date of Distributions.**

Unless otherwise provided in this Plan, any distributions or deliveries to be made under this Plan shall be made on the Effective Date or as otherwise contemplated herein. Thereafter, the Reorganized Debtor will make distributions from time to time in accordance with this Plan and the New Organizational Documents. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act shall be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**7.2 Sources of Distribution.**

All distributions will be made by the Reorganized Debtor to holders of Claims or Equity Interests in the form of the New Common Stock. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth herein applicable to

such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, of certain securities in connection with the Plan will be exempt from SEC registration to the fullest extent permitted by law, as described more fully in section 7.14 below.

### 7.3 Reorganized Debtor.

All distributions under the Plan shall be made by the Reorganized Debtor. The Reorganized Debtor shall not be required to post any bond, surety or other security for the performance of its duties hereunder unless otherwise ordered by the Bankruptcy Court. The Reorganized Debtor shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent him with respect to its responsibilities, (d) compensate and reimburse such professionals, and (e) exercise such other powers as may be vested in the Reorganized Debtor by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Reorganized Debtor to be necessary and proper to implement the provisions hereof.

### 7.4 Record Date for Distributions.

At the close of business on the Distribution Record Date, the transfer ledgers or registers for Claims against the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims. Neither the Debtor nor the Reorganized Debtor shall have any obligation to recognize any transfer of any of the foregoing occurring after the Distribution Record Date, and shall be entitled instead to recognize for all purposes hereunder, including to effect distributions hereunder, only those record holders stated on the transfer ledgers or registers maintained by the Debtor as of the close of business on the Distribution Record Date.

### 7.5 Recipients of Distributions.

All distributions to holders of Allowed Claims or Equity Interests under the Plan shall be made to the holder of the Claim or Equity Interest as of the Distribution Record Date. Changes as to the holder of a Claim or Equity Interest after the Distribution Record Date shall only be valid and recognized for distribution if notice of such change is filed with the Bankruptcy Court, in accordance with Bankruptcy Rule 3001 (if applicable) and served upon the Debtor and its counsel and, if applicable, the Reorganized Debtor.

### 7.6 Delivery of Distributions and Undeliverable or Unclaimed Distributions.

Subject to Bankruptcy Rule 9010, all distributions under the Plan shall be made at the address of each holder of an Allowed Claim as set forth in the books and records of the Debtor or the Reorganized Debtor, as applicable, unless the Debtor or the Reorganized Debtor, as applicable, has been notified in writing of a change of address. If any distribution to the holder of an Allowed Claim is returned as undeliverable, no further distributions to such holder shall be made unless and until the Debtor or the Reorganized Debtor, as applicable, is notified of such holder's then-current address, at which time all missed distributions shall be made to such holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of ninety (90) days after the date of the

distribution in question. After such 90th day, and notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary (i) all unclaimed property or interest in property in respect of the distribution in question shall revert to the Reorganized Debtor, and thereafter be distributed Pro Rata to the holders of Allowed Claims in accordance with the terms of this Plan, and (ii) the Claim of any holder with respect to such unclaimed property or interest in property shall be discharged and forever barred.

### 7.7 Means of Payment.

All distributions made pursuant to the Plan shall be in New Common Stock or Cash as indicated.

### 7.8 Setoffs and Recoupment.

The Debtor or the Reorganized Debtor, as applicable, may, but shall not be required to, setoff against or recoup from any Claim any rights to payment that the Estate may have or may have had against the holder of such Claim. Neither the failure of the Debtor or the Reorganized Debtor, as applicable, to setoff or recoup, nor the Allowance of any Claim shall constitute a waiver or release by the Estate or the Reorganized Debtor of any right to payment, or right of setoff or recoupment.

### 7.9 Distributions After Effective Date.

Distributions made pursuant to this Plan after the Effective Date to holders of Disputed Claims that are not Allowed as of the Effective Date, shall be deemed to have been made on the Effective Date. After any such initial distribution, the Reorganized Debtor shall make additional interim distributions to holders of Allowed Claims and Allowed Equity Interests at such time as the Reorganized Debtor may deem appropriate, in accordance with the terms of this Plan.

### 7.10 Withholding and Reporting Requirements.

In connection with this Plan and any instruments issued under this Plan, any party issuing any instrument or making any such distribution under this Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Equity Interest that is entitled to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any applicable tax obligations, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under this Plan to any holder of any Allowed Claim or Allowed Equity Interest has the right, but not the obligation, to not issue such instrument or make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

### 7.11 Time Bar to Distributions.

Any cash distribution issued by the Reorganized Debtor under this Plan shall be null and void if not negotiated within ninety (90) days after the date of issuance. After such 90-day period,

if no request for re-issuance of a voided check was timely made, such amounts shall constitute unclaimed property and be treated in accordance with Section 7.6 of this Plan, and all Claims in respect of such void checks shall be discharged and forever barred.

### 7.12 No Fractional Distributions.

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an applicable Allowed Claim or Equity Interest would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded to the next higher whole number. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims and Interests shall be adjusted as necessary to account for the foregoing rounding.

### 7.13 Minimum Distribution.

No Cash payment of less than $50 or issuance of New Common Stock fewer than one (1) share shall be made to a Holder of an Allowed Claim on account of such Allowed Claim. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing minimum distribution threshold.

### 7.14 SEC Exemption.

The New Common Stock is or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

All shares of the New Common Stock, including the KIMO Class A Common Stock, the KIMO Class B Common Stock, the KIMO Warrants, the ISH Class A Common Stock, the ISH Class B Common Stock and the ISH Warrants, issued or authorized pursuant to the Plan will be issued in reliance upon section 1145 of the Bankruptcy Code. Pursuant to section 1145 of the Bankruptcy Code, the issuance of (1) the New Common Stock, and (2) any other securities issued in reliance on section 1145 of the Bankruptcy Code, are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration before the offering, issuance, distribution, or sale of such securities. Each of the foregoing securities (a) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable (except as provided in the Unsecured Claims Distribution Trust Documents) by any initial recipient thereof that (i) at the time of transfer, is not an "affiliate" of the Reorganized Debtor as defined in Rule 144(a)(1) under the Securities Act and has not been such an "affiliate" within 90 days of such transfer, and (ii) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

Should the Reorganized Debtor elect on or after the Effective Date to reflect any ownership of the New Common Stock, the Reorganized Debtor need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock under applicable securities laws.

## ARTICLE VIII. PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

### 8.1 Objections to Claims.

Except insofar as a Claim or Equity Interest is Allowed under the Plan or pursuant to Final Order of the Bankruptcy Court, the Debtor or the Reorganized Debtor shall be entitled to object to Claims and Equity Interests, including objections seeking reclassification or subordination of such Claims or Equity Interests. Any objections to Claims or Equity Interests shall be served and filed by the Objection Deadline. Any Claim or Equity Interest as to which an objection is timely filed shall be a Disputed Claim or Equity Interest.

### 8.2 No Distributions Pending Allowance.

If a timely objection is made with respect to any Claim or Equity Interest, no payment or distribution under the Plan shall be made on account of such Disputed Claim or Equity Interest unless and until such Disputed Claim or Equity Interest becomes Allowed.

### 8.3 Distributions After Allowance.

To the extent that a Disputed Claim or Equity Interest ultimately becomes an Allowed Claim or an Allowed Equity Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Equity Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Equity Interest becomes a Final Order, the Reorganized Debtor shall provide to the holder of such Claim or Equity Interest the distribution (if any) to which such holder is entitled under this Plan as of the Effective Date, without any interest.

### 8.4 Disallowance of Late Filed Claims.

Unless otherwise provided in a Final Order of the Bankruptcy Court, any Claim or Equity Interest for which a proof of claim or interest is filed after the applicable Bar Date shall be deemed disallowed. The holder of a Claim or Equity Interest that is disallowed pursuant to this Section 8.4 shall not receive any distribution on account of such Claim or Equity Interest, and neither the Debtor nor the Reorganized Debtor shall need to take any affirmative action for such Claim or Equity Interest to be deemed disallowed.

## ARTICLE IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 9.1 Rejection of Contracts and Leases.

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtor shall be deemed to have rejected each executory contract and unexpired lease to which it is a party, unless such contract or lease (i) was previously assumed, assumed and assigned or rejected by the Debtor, (ii) previously expired or terminated pursuant to its own terms, or (iii) is the subject of a motion to assume, assume and assign, or reject filed by the Debtor on or before the

Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Effective Date.

**9.2    Inclusiveness.**

Unless otherwise specified, each executory contract and unexpired lease shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease.

**9.3    Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

All Claims arising out of the rejection of executory contracts and unexpired leases (if any) must be served upon the Debtor or Reorganized Debtor, as applicable, and its counsel within thirty (30) days after the earlier of (i) the date of entry of an order of the Bankruptcy Court approving such rejection or (ii) the Effective Date. Any Claims not filed within such time shall be forever barred from assertion against the Debtor, the Estate, its property and the Reorganized Debtor.

## ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

**10.1    Conditions to Confirmation of Plan.**

Confirmation of the Plan shall not occur, and the Confirmation Order shall not be entered, until an order, finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered.

**10.2    Conditions to Effective Date of Plan.**

The Effective Date of the Plan shall not occur until each of the following conditions precedent have been satisfied or waived:

> (a)    The clerk of the Bankruptcy Court shall have entered the Confirmation Order in the Chapter 11 Case and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto;

> (b)    The Confirmation Order shall have become a Final Order; and

> (c)    All other actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan shall have been executed and delivered by the parties thereto, and, in each case, all conditions to their effectiveness shall have been satisfied or waived as provided therein.

Within five (5) Business Days of the Effective Date, the Debtor shall file a notice of the occurrence of the Effective Date.

### 10.3 Waiver of Conditions Precedent.

Any of the foregoing conditions (with the exception of the conditions set forth in Sections 10.1 and 10.2(a)) may be waived by the Debtor without notice to or order of the Bankruptcy Court. The Debtor may assert a failure to satisfy or waiver of any condition regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each such right will be deemed an on-going right that may be asserted at any time.

### 10.4 Effect of Failure of Conditions.

If the foregoing conditions have not been satisfied or waived in the manner provided in Sections 10.1, 10.2 and 10.3 hereof, then (i) the Confirmation Order shall be of no further force or effect; (ii) no distributions under the Plan shall be made; (iii) the Estate and all holders of Claims against or Equity Interests in the Debtor shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; (iv) all of the Estate's obligations with respect to Claims and Equity Interests shall remain unaffected by the Plan; (v) nothing contained in this Plan shall be deemed to constitute a waiver or release of any Claims by or against or Equity Interests by or in the Estate or any other Person or to prejudice in any manner the rights of the Estate or any Person in any further proceedings involving the Debtor or the Estate; and (vi) this Plan shall be deemed withdrawn. Upon such occurrence, the Debtor shall file a written notification with the Bankruptcy Court and serve it on the parties appearing on the service list maintained in the Chapter 11 Case.

### 10.5 Reservation of Rights.

The Plan shall have no force or effect unless and until the Effective Date occurs. Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtor with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of the Estate or any other party with respect to any Claims or Equity Interests or any other matter.

## ARTICLE XI. EFFECT OF CONSUMMATION

### 11.1 Discharge of Claims and Interests in the Debtor.

Upon the Effective Date and in consideration of the distributions to be made under this Plan, except as otherwise provided in this Plan or in the Confirmation Order, each holder (as well as any trustee or agent on behalf of such holder) of a Claim, where such Claim or Interest has been fully paid or otherwise satisfied in accordance with this Plan, and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor, to the fullest extent permitted under § 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in this Plan, all such holders of Claims, and their affiliates shall be forever precluded and enjoined, pursuant to §§ 105, 525, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against the Debtor or the Reorganized Debtor.

### 11.2 Injunction against Interference with Plan.

Upon the entry of the Confirmation Order, all holders of Claims or Equity Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation of the Plan or the occurrence of the Effective Date.

### 11.3 Exculpation.

Neither the Exculpated Parties nor any of their respective present or former members, managers, officers, directors, employees, equity holders, partners, affiliates, funds, advisors, attorneys or agents, or any of their predecessors, successors or assigns, shall have or incur any liability to any holder of a Claim or Equity Interest or any other party-in-interest, or any of their respective agents, employees, equity holders, partners, members, affiliates, funds, advisors, attorneys or agents, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the administration of the Chapter 11 Case, the negotiation and pursuit of approval of the Disclosure Statement, the preparation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the funding of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, and shall be deemed to have acted in good faith in connection therewith and entitled to the protections of section 1125(e) of the Bankruptcy Code. Notwithstanding anything to the contrary contained in this Plan, this Section 11.3 shall not exculpate any party from any liability based upon gross negligence or willful misconduct.

### 11.4 Debtor and Estate Releases

As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce this Plan, for good and valuable consideration, the adequacy of which is hereby confirmed, the service of the Released Parties to facilitate the administration of the Estate, a substantial recovery for holders of Allowed Claims, and the implementation of this Plan, and except as otherwise provided in this Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the Debtor, the Reorganized Debtor, and the Estate on behalf of themselves and their respective successors, assigns, and representatives and any and all other entities that may purport to assert any cause of action derivatively, by or through the foregoing entities (together, the "***Releasing Parties***"), from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action, losses, remedies, or liabilities, whatsoever, including any derivative claims, asserted or assertable on behalf of the Releasing Parties, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Releasing Parties would have been legally entitled to assert in their own right, or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Estate, the Chapter 11 Case, the Lender Settlement, the subject matter of, or the loans or other transactions or events giving rise to, any Claim or Equity Interest, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Case, the restructuring transactions, the negotiation, formulation, or preparation of the Disclosure Statement and this Plan and related agreements, instruments, and other documents, the solicitation of votes with respect to this Plan, or any other act or omission,

transaction, agreement, event, or other occurrence, other than claims or causes of action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, and willful misconduct. Further, the Plan releases all causes of action under Section 547 of the Bankruptcy Code against all Entities.

**11.5  Injunction and Stay.**

(a)    Except as otherwise expressly provided in this Plan, all Persons or entities who have held, hold, or may hold Claims or causes of action against or Equity Interests in the Debtor or any Released Party are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or cause of action against or Equity Interest in the Estate or any entity released, discharged or exculpated hereunder, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Estate with respect to any such Claim, (iii) creating, perfecting or enforcing any encumbrance of any kind against the Estate or against the property held by the Reorganized Debtor (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Estate, or against the property or interests in property of the Estate with respect to any such Claim or Equity Interest, or (v) pursuing any Claim or causes of action released under the Plan.

(b)    Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

(c)    The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively, or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, losses, or liabilities released pursuant to this Plan, including, without limitation, the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities released or exculpated in this Plan.

**11.6  Preservation of Claims.**

(a)    Except as otherwise provided herein, as of the Confirmation Date, pursuant to sections 1123(b)(3)(B) of the Bankruptcy Code, any action, cause of action, claim, liability, obligation, right, suit, debt, sum of money, damage, judgment, Claim, and demand whatsoever, whether known or unknown, at law, in equity, or otherwise, including causes of action under Chapter 5 of the Bankruptcy Code, owned by or otherwise accruing to the Debtor or the Estate shall constitute assets of, and shall immediately be transferred to and vest in, the Reorganized Debtor. Thereafter, the Reorganized Debtor, as a representative of the Debtor and the Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, shall have sole and full authority to commence and prosecute any causes of action that may arise for the benefit of the holders of Claims and Equity Interests. Notwithstanding the general

preservation of causes of action under Chapter 5 of the Bankruptcy Code, the Plan releases any and all causes of action under Section 547 of the Bankruptcy Code against all parties.

**11.7 Compromise of Controversies.**

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019 and section 1123(b)(3)(A).

## ARTICLE XII. RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a) To hear and determine pending applications for the assumption, assignment or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(b) To determine any and all adversary proceedings, applications, and contested matters in the Chapter 11 Case and grant or deny any application involving the Debtor or the Estate that may be pending on the Effective Date or that are retained and preserved by the Reorganized Debtor herein;

(c) To ensure that distributions to holders of Allowed Claims and Allowed Equity Interests are effected as provided in the Plan;

(d) To hear and determine any timely objections to Administrative Expense Claims or to proofs of Claim and Equity Interests, including any objections to the classification of any Claim or Equity Interest, and to allow or disallow any Disputed Claim or Equity Interest, in whole or in part;

(e) To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(f) To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or maintain the integrity of the Plan following consummation;

(g) To consider any amendments to or modifications of the Plan, or to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(h) To hear and determine all requests for payment of Fee Claims;

(i)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the documents that are ancillary to and aid in effectuating the Plan or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(k)     To hear any other matter not inconsistent with the Bankruptcy Code;

(l)     To hear and determine all disputes involving the existence, scope, and nature of the injunctions, exculpations and releases granted hereunder;

(m)     To issue injunctions and effect any other actions that may be necessary or desirable to restrain interference by any entity with the consummation or implementation of the Plan; and

(n)     To enter a final decree(s) closing the Chapter 11 Case.

## ARTICLE XIII. MISCELLANEOUS

### 13.1    Payment of Statutory Fees.

All fees payable under 28 U.S.C. § 1930 shall be paid by the Reorganized Debtor from Distributable Cash on the Effective Date and thereafter, as appropriate.

### 13.2    Filing of Additional Documents.

The Debtor or Reorganized Debtor may file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 13.3    Schedules, Exhibits and Plan Supplement Incorporated.

All exhibits and schedules to the Plan are incorporated into and are a part of the Plan as if fully set forth herein.

### 13.4    Amendment or Modification of the Plan.

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, alterations, amendments or modifications of the Plan may be proposed in writing by the Debtor or Reorganized Debtor, as applicable, at any time prior to or after the Confirmation Date. Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified; *provided*, *however*, that any holders of Claims and Equity Interests who were deemed to accept the Plan because such Claims and Equity Interests were unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modification, such Claims and Equity Interests continue to be unimpaired.

### 13.5 Inconsistency.

In the event of any inconsistency among the Plan, the Disclosure Statement, and any exhibit or schedule to the Disclosure Statement, the provisions of the Plan shall govern. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall govern.

### 13.6 Exemption from Certain Transfer Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or New Common Stock under or in connection with the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax. All sale transactions consummated by the Debtor or the Estate and approved by the Bankruptcy Court on and after the Petition Date through and including the Effective Date, including the transfers effectuated under the Plan, the sale by the Debtor of property pursuant to section 363(b) or (f) of the Bankruptcy Code, and the assumption, assignment, and sale by the Estate of unexpired leases of non-residential real property pursuant to section 365(a) of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan, and thus, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### 13.7 Expedited Tax Determination.

The Debtor of the Reorganized Debtor, as successor to the Debtor, may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtor for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

### 13.8 Binding Effect.

Except as otherwise provided in section 1141(d) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after entry of the Confirmation Order, the provisions of this Plan and Confirmation Order shall be binding upon and inure to the benefit of the Debtor, the Estate, the Released Parties, the Releasing Parties, any holder of any Claim or Equity Interest, or any Person named or referred to in this Plan, and each of their respective heirs, executors, administrators, representatives, predecessors, successors, assigns, agents, officers and directors, and, as to the binding effect, to the fullest extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by this Plan and Confirmation Order.

### 13.9 Severability.

If the Bankruptcy Court determines that any provision of this Plan is unenforceable either on its face or as applied to any Claim or Equity Interest, the Debtor may modify this Plan in accordance with Section 13.4 hereof so that such provision shall not be applicable to the holder of such Claim or Equity Interest. Any determination of unenforceability shall not (i) limit or affect

the enforceability and operative effect of any other provisions of this Plan; or (ii) require the re-solicitation of any acceptance or rejection of this Plan unless otherwise ordered by the Bankruptcy Court.

### 13.10   No Payment of Attorneys' Fees.

Except for the fees of Professional Persons, no attorneys' fees shall be paid by the Estate with respect to any Claim or Equity Interest unless otherwise specified in this Plan or a Final Order of the Bankruptcy Court.

### 13.11   Notices.

All notices, requests, and demands to or upon the Estate to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

HAWAIIAN VINTAGE CHOCOLATE COMPANY, INC.
Debtor-in-Possession
4145 Beltline Road
P.O. Box 212-101
Addison, Texas 75001

with a copy to:

WICK PHILLIPS GOULD & MARTIN, LLP
Attention: Jason M. Rudd
3131 McKinney Ave, Suite 500
Dallas, Texas 75204
Telephone: 214-692-6200
jason.rudd@wickphillips.com

### 13.12   Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to the principles of conflict of laws that would require application of the laws of another jurisdiction.

HAWAIIAN VINTAGE CHOCOLATE COMPANY, INC.

/s/ James Walsh
By James Walsh, President


WICK PHILLIPS GOULD & MARTIN, LLP

/s/ Jason M. Rudd
Jason M. Rudd, Tex. Bar No. 24028786
Scott D. Lawrence, Tex. Bar No. 24087896
Catherine A. Curtis, Tex. Bar No. 24095708
3131 McKinney Ave, Suite 500
Dallas, Texas 75204
Telephone: 214-692-6200
jason.rudd@wickphillips.com
scott.lawrence@wickphillips.com
catherine.curtis@wickphillips.com

PROPOSED COUNSEL FOR DEBTOR

**Exhibit B**

**Organizational Chart of Reorganized Debtor**



**Exhibit C**

**Reorganized Debtor's Pro Forma Projections**

## AZOTH SUMMARY P&L
### (in $'000's)

| | 2021 | 2022 | 2023 | 2024 | Growth Rate 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| **Gross Revenue** | $6,375,000 | $25,390,250 | $57,892,324 | $82,913,245 | *398%* | *228%* | *143%* |
| COGS | 2,868,750 | 10,790,856 | 23,156,930 | 32,336,166 | *376%* | *215%* | *140%* |
| **Gross Profit** | **$3,506,250** | **$14,599,394** | **$34,735,394** | **$50,577,079** | *416%* | *416%* | *238%* |
| **Operating Costs** | | | | | | | |
| Product Dev | 525,938 | 1,840,781 | 2,761,172 | 3,313,406 | *350%* | *150%* | *120%* |
| Sales & Marketing | 2,647,219 | 7,941,656 | 13,897,898 | 20,846,848 | *300%* | *175%* | *150%* |
| G&A | 1,227,188 | 2,454,375 | 3,190,688 | 9,572,063 | *200%* | *130%* | *300%* |
| **Total Operating Exp** | **4,400,344** | **12,236,813** | **19,849,758** | **33,732,316** | *278%* | *162%* | *170%* |
| *Opex growth %* | | | | | | | |
| **EBITDA** | **($894,094)** | **$2,362,581** | **$14,885,637** | **$16,844,763** | *264%* | *630%* | *113%* |
| **CUM EBITDA** | **($894,094)** | **$1,468,488** | **$16,354,124** | **$33,198,887** | | | |

**Azoth**
**CASHFLOW FORECAST**

| | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|
| **Net Receipts** | $6,375,000 | $25,390,250 | $57,892,324 | $82,913,245 |
| **TOTAL COGS** | $2,868,750 | $10,790,856 | $23,156,930 | $32,336,166 |
| **Gross Margin** | 3,506,250 | 14,599,394 | 34,735,394 | 50,577,079 |
| **Operating Disbursements** | | - | | |
| Product | 525,938 | 1,840,781 | 2,761,172 | 3,313,406 |
| Sales & Marketing | 2,647,219 | 7,941,656 | 13,897,898 | 20,846,848 |
| G&A | 1,227,188 | 2,454,375 | 3,190,688 | 9,572,063 |
| **Total Operating** | 4,400,344 | 12,236,813 | 19,849,758 | 33,732,316 |
| **Balance Sheet Changes** | - | - | - | - |
| **CF from Operations** | (894,094) | 2,362,581 | 14,885,637 | 16,844,763 |
| Taxes | - | - | - | - |
| **Net CF from Operations** | ($894,094) | $2,362,581 | $14,885,637 | $16,844,763 |
| Capital Expenditures | 2,365,000 | 1,223,456 | 3,560,023 | 1,354,321 |
| Investment Capital | 5,000,000 | 2,000,000 | - | - |
| **Cash flow from Financing** | $7,365,000 | $3,223,456 | $3,560,023 | $1,354,321 |
| Beginning Cash Balance | $978,456 | $7,449,362 | $13,035,400 | $31,481,059 |
| **Ending Cash Balance** | $7,449,362 | $13,035,400 | $31,481,059 | $49,680,143 |

**INNER STATE**
**Balance Sheets**
**For the Year Ending December 31,**

| | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | $ 1,580 | $ 1,331 | $ 8,749 | $ 12,387 |
| Accounts Receivable, net | | - | 485 | 828 |
| Inventory | | 1,910 | 4,048 | 5,000 |
| Investment | | 1,000 | 1,000 | 1,000 |
| SW Asset | 288 | 1,394 | 1,722 | 2,070 |
| Net Property, Plant, and Equipm | 2 | 341 | 447 | 461 |
| **Total Assets** | **1,870** | **5,975** | **16,452** | **21,747** |
| | | | | |
| **Liabilities and Shareholder Equity** | | | | |
| **ST Liabilities** | | | | |
| Accounts payable | - | - | - | - |
| Accrued Expenses | | | | |
| | - | - | - | - |
| **LT Liabilities** | | | | |
| Deferred Revenue | | | | |
| Tax Liability/(Tax Asset) | (40) | (938) | (170) | 1,472 |
| Line of Credit | - | | - | - |
| Shareholder loan | - | - | - | - |
| | - | - | - | - |
| | **(40)** | **(938)** | **(170)** | **1,472** |
| **Equity** | | | | |
| Common Stock | 2,000 | 9,000 | 17,000 | 17,000 |
| Net Income | (90) | (1,997) | 1,709 | 3,654 |
| Retained Earnings | | (90) | (2,087) | (378) |

|                                   | 1,910 | 6,913   | 16,622   | 20,275   |
|-----------------------------------|-------|---------|----------|----------|
| **Total Liabilities & S/H Equity** | 1,870 | $5,975  | $16,452  | $21,747  |

*balance*      -      -      -      -

**INNER STATE**
**SUMMARY P&L**
(in $'000's)

| | 2021 | 2022 | 2023 | 2024 | | % of Revenue 2022 | 2023 | 2024 | Growth Rate 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gross Revenue** | **$0** | **$1,207** | **$20,858** | **$44,152** | | | | | | **1628%** | **112%** |
| VR Sub Revenue | $0 | $499 | $3,934 | $8,379 | | 41% | 19% | 19% | | 689% | 113% |
| Box Sub Revenue | - | 708 | 6,005 | 10,791 | | 59% | 29% | 24% | | 748% | 80% |
| Shroom Room Revenue | | - | 4,977 | 14,842 | | 0% | 24% | 34% | | 100% | 198% |
| Adapt Product Revenue | | - | 3,443 | 7,140 | | 0% | 17% | 16% | | | 100% |
| Acquisition | | | 2,500 | 3,000 | | 0% | 12% | 7% | | | 100% |
| Allowances | - | (60) | (865) | (1,903) | | -5% | -4% | -4% | | 1333% | 120% |
| **Net Revenue** | **$0** | **$1,147** | **$19,994** | **$42,249** | | **95%** | **96%** | **96%** | | **1644%** | **111%** |
| COGS | - | 469 | 9,993 | 20,200 | | 39% | 48% | 46% | | 2032% | 102% |
| **Gross Profit** | **$0** | **$678** | **$10,001** | **$22,048** | | **56%** | **48%** | **50%** | | **1376%** | **120%** |
| **Operating Costs** | | | | | | | | | | | |
| Product Dev | 13 | 2,145 | 3,093 | 4,811 | 10% | 178% | 15% | 11% | 17061% | 44% | 56% |
| Sales & Marketing | 26 | 654 | 3,384 | 10,587 | 20% | 54% | 16% | 24% | 2448% | 417% | 213% |
| G&A | 92 | 675 | 843 | 1,045 | 71% | 56% | 4% | 2% | 634% | 25% | 24% |
| **Total Operating Exp** | **130** | **3,474** | **7,319** | **16,443** | **100%** | **288%** | **35%** | **37%** | **2570%** | **111%** | **125%** |
| *Opex growth %* | | | | | | | | | | | |
| **EBITDA** | **($130)** | **($2,796)** | **$2,682** | **$5,605** | **-100%** | **-232%** | **13%** | **13%** | **2049%** | **196%** | **109%** |
| *Headcount* | *1* | *7* | *13* | *25* | | | | | | | |
| **CUM EBITDA** | **($130)** | **($2,926)** | **($245)** | **$5,361** | | | | | | | |
| | - | - | - | - | | | | | | | |

*Q422: Acquistion of controlling interest in $2-3M with brand awareness in consumer products, $500k profit*