IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 21-32112 |
| HAWAIIAN VINTAGE CHOCOLATE | § | |
| COMPANY, INC., | § | Chapter 11 |
| | § | |
| DEBTOR. | | |

**DECLARATION OF JAMES WALSH, CHIEF EXECUTIVE OFFICER
IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, James Walsh, hereby declare under penalty of perjury:

1. I am the Chief Executive Officer of Debtor Hawaiian Vintage Chocolate Company, Inc. ("Debtor"), a corporation organized under the laws of Hawaii. I have been the Chief Executive Officer since the company's founding.

2. As Chief Executive Officer, I was responsible for overseeing the Debtor's operations and financial activities. As a result of my tenure with Debtor, my review of public and non-public documents, I am familiar with the Debtor's business, financial condition, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein in the ordinary course of my responsibilities.

3. I am over the age of 18, and I am authorized to submit this declaration on behalf of the Debtor. References to the Bankruptcy Code (as defined herein), the chapter 11 process, and related legal matters are based on my understanding of such as explained to me by counsel. If called upon to testify, I would testify competently to the facts set forth in this declaration.

4. On November 30, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Northern District of Texas (the "Court"), initiating this

chapter 11 case (the "Case"). The Debtor filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions"). I submit this declaration to assist the Court and parties in interest in understanding the circumstances resulting in the commencement of this Case and in support of the Debtor's chapter 11 petition and First Day Motions.

5. On the Petition Date, the Debtor filed its Prepackaged Chapter 11 Plan (the "Plan") [ECF NO. 6], and the Debtor's Disclosure Statement for Debtor's Prepackaged Chapter 11 Plan (the "Disclosure Statement") [ECF No. 5].

6. On the Petition Date, the Debtor filed its Emergency Motion for Entry of an Order Authorizing the Debtor to Redact Certain Personal Identification Information and Granting Related Relief (the "Redaction Motion") [ECF No. 8].

7. Also on the Petition Date, the Debtor filed its Emergency Motion for Entry of an Order (i) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (ii) Approving the Solicitation Procedures and Dates, Deadlines, and Notices Related Thereto, (iii) Directing That a Meeting of Creditors not be Convened, (iv) Waiving the Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities, and (v) Granting Related Relief (the "Scheduling Motion") [ECF No. 9].

**Background**

A. **Debtor's History and Circumstances Leading Up to the Restructuring.**

8. The Debtor is a publicly traded company that was incorporated in July 1993 under the laws of the State of Hawaii to engage in the development, growing, manufacturing, marketing and branding of cocoa and chocolate products. The Debtor's initial corporate strategy led to the development of proprietary Hawaiian cocoa cultivars that were planted either independently or corporately on the Big Island of Hawaii. The resulting cocoa crops led to the development of the

Debtor's concept of varietal chocolate. The Debtor developed unique proprietary planting and propagation systems for cacao, coffee, vanilla, and edible mushrooms. The vanilla and mushroom growing technology underwent field trials for several years both in Hawaii and the Philippines where crop specific post-harvest handling and processing techniques were developed but, due to capital restraints, never commercialized.

9. The Debtor developed cultivars and planted three generation of trees on lands around the Big Island of Hawaii. The Debtor discontinued the initial strategy of using independent growers to expand its crop due to the lack of agricultural education and training available for the local sugar and pineapple workforce. The Debtor's future depended on the maturation and cultivation of sufficient number of trees around the island to meet its chocolate market needs. The Debtor planned to continue its corporate planting program to rely on its own cocoa beans for the majority of its chocolate products. Meanwhile, the Debtor continued to evolve into a retail brand development and marketing company.

10. In December of 1997, the Debtor went public with the trading of its common stock on the National Association of Securities Dealers OTC Bulletin Board, under the stock symbol "HWVI" to attract public capital. The Debtor's common stock is quoted in the National Quotation Bureau's "Pink Sheets".

11. Beginning in 1998, the Debtor started a transition from agricultural cocoa genetics and chocolate product development to an operating company. The Debtor operated as a grower, manufacturer, and marketer of gourmet cocoa and chocolate brands. The Debtor produced and marketed gourmet cocoa and chocolate products manufactured from cocoa beans selected from a variety of locations around the world including beans grown by the Debtor in the State of Hawaii for both wholesale and retail sale to the public.

12. Drought conditions in Hawaii and the relative infancy of the Debtor's planting program adversely effected the Debtor's cultivation activities, forcing the Debtor to utilize more selected cocoa beans from third-party growers than planned. Further, the capital the Debtor attracted proved inadequate to sufficiently scale its agriculture efforts. As a result, the Debtor pivoted to a brand marketing company whose product competed with international brands like Hershey and Nestle while continuing to seek alternatives as an agricultural company, food service supplier, and retailer. Brand partnerships with Pepsi affiliates, functional foods companies, and distribution houses allowed the Debtor to mature beyond its initial purpose, but the conditions inherent in Hawaiian agriculture prevented the Debtor from achieving its original objectives to help Hawaii find an agricultural replacement for its failing pineapple and sugar crops. Competing with companies like Hershey Foods and Nestle required more capital and personnel than the Debtor could sustain. By the early 2000s, the Debtor closed its offices in Hawaii and only had an internet presence. Eventually the Debtor could no longer support significant online marketing efforts becoming a non-operating OTC stock which has traded consistently until current time.

13. With the advent of the new SEC ruling on non-reporting stocks being delisted, the stock will no longer have any value for shareholders. The Debtor's stock last traded at $0.0006 per share. With only specialized agricultural expertise and trademarks left as assets, the Debtor is seeking the relief of reorganization under chapter 11 of the Bankruptcy Code to maximize value to creditors and shareholders. In particular, the Allison Investment Corporation (the "Lender") has a pre-petition unsecured claim, and the only feasible way to pay the Lender's claim is to effectuate the mergers outlined below and detailed in the Plan (as defined below) to create new value to satisfy the Lender's claim. The Lender also holds a small equity interest in the Debtor that the Lender accepted in exchange for a partial debt forgiveness in a prior restructuring, but the Lender

is not an insider of the Debtor.

**B.    The Debtor's Creditors**

14.    The Debtor has no known secured creditors with valid liens as of the Petition Date. The Debtor is aware of four unsecured creditors with valid claims, totaling just over $1 million, with approximately $140,000 held by non-insiders.

| Creditor | Est. Allowed Claim | Insider |
|---|---|---|
| Mid America Gourmet | $7,345 | No |
| Allison Investment Corporation | $134,157 | No |
| WF Trust | $49,537 | Yes |
| Senex | $825,000 | Yes |
| Total Unsecured Claims | $1,016,039 | |

15.    WF Trust also owns approximately forty percent (40%) of the Debtor's outstanding equity. My family is the beneficiary of WF Trust, and I own Senex, so the Debtor notes that these two claims are held by insiders; however, Allison Investment Corporation and Mid America Gourmet are not insiders and support the Plan.

**C.    Restructuring Path Forward.**

16.    Lacking sufficient going concern operations and cash flow to pay these creditors, the Debtor considered numerous options to create value and satisfy creditor claims, including liquidation of its core IP assets. The Debtor determined that a strategic merger with operating businesses that could capitalize on the Debtor's agricultural IP, cloning, field engineering techniques and independent grower systems presented the best option to generate superior long-term value for all stakeholders. Accordingly, the Debtor, Azoth, Inc., and Inner State, Inc. reached terms in the form of the proposed mergers in the Disclosure Statement and Plan to combine their operations and distribute significant ownership to the Debtor's creditors and shareholders. The Debtor proposes to effectuate the Mergers through the Plan, and the Mergers are conditioned on

confirmation of the Plan. Each merger is discussed briefly below and detailed in the Disclosure Statement.

17.  **Azoth, Inc**. **Merger** - The Plan proposes for the Reorganized Debtor to merge with Azoth, Inc. ("Azoth"), with the post-merger Reorganized Debtor changing its name to KIMO, Inc. (the "Azoth Merger"). Azoth, Inc. has a successful track record for the manufacture, distribution, and marketing of branded spirits products in the United States with offerings in the agave spirits market through its flagship brand Kimo Sabe, in the craft distilling market with its Surf City brand of bourbon, whiskey, vodka, rum, gin and seltzers, and national distribution of its Ready to Drink ("RTDs") cocktails under its Luminar brand.

18.  Azoth holds three separate operating units, DWLL LLC ("DWLL Sub"), Surf City Still Works LLC ("Surf City Sub"), and Kimo Sabe S.A.P.I. de CV ("Kimo Sabe Sub", together with the DWLL Sub and the Surf City Sub, the "Target Subs").

- The DWLL Sub produces and markets alcoholic agave products primary through its two brands Kimo Sabe and Luminar.

- The Surf City Sub operates a 25,000 square foot California state-of-the-art distillery facility with distillery, brewery, and winery licenses.

- Kimo Sabe Sub serves as Azoth's Mexican operational arm. Organized in 2013 to source raw material, manufacture spirit-based products, distribute Azoth group products within Mexico, to export products to its U.S. operations and to maintain standards and quality control for all products produced in Mexico.

19.  The Reorganized Debtor will own the Target Subs and deploy the Debtor's agricultural IP for upgrading agave cultivation methods and applying the Debtor's cloning and field engineering techniques. It will also produce a line of liquor-based chocolates featuring the Kimo Sabe mezcal and Surf City whiskies. It is anticipated that the Debtor's independent grower systems will be utilized in the small grower programs used in Mexico.

20. The Reorganized Debtor's growth strategy focuses on developing, manufacturing, and promoting new generation beverages and related products both alcoholic and non-alcoholic in the "better for you" consumer category. Better for you nomenclature refers to beverages with attributes the consumer perceives as healthy or less harmful than mainstream offerings and represents one of the fastest growing beverage market sectors. Examples of this are low calorie, less high alcohols, nutritional benefits, organic, hand crafted, farm to table, all natural, less sugar, probiotic, hydrating electrolytes, etc. Azoth's existing products have one or several of these attributes and following its merger with the Debtor to form KIMO, the Reorganized Debtor's new products to be introduced in 2022 will focus on better for you attributes in both the alcoholic and non-alcoholic categories.

21. Through the Plan, the Debtor's prepetition creditors and shareholders will receive new common stock and related warrants in the Reorganized Debtor in satisfaction of their claims.

22. WF Trust, an insider of the Debtor, owns approximately three million shares out approximately twelve million outstanding shares of Azoth, and I am an officer of Azoth.

23. **Inner State Inc. Merger** – The Plan also proposes for the Reorganized Debtor to form a wholly owned subsidiary - in addition to the Target Subs - called Inner State Health, Inc. (the "ISH Sub") to merge (the "ISI Merger") with Inner State, Inc. ("ISI"). ISI is an entheogenic and functional plant-based wellness company formed to provide natural plant-based alternatives to anxiety, depression, female endocrinologic issues, and general cognitive skill enhancements. "Entheogenic" describes plants that have medicinal and often hallucinogenic or spiritual properties such as psilocybin, dimethyltryptamine, ayahuasca and peyote. The U.S. Drug Enforcement Administration and Food and Drug Administration have federally approved synthesized psilocybin for research use only.

24. The ISI Merger permits the ISH Sub to incorporate the Debtor's field-tested growing and hybridization system to advance its grow house technology, lower its costs, and increase the company's branded products efficacy. The ISH Sub will also issue new shares of stock directly to the Debtor's Claim Holders and Interest Holders.

25. Neither the Debtor nor I hold any ownership interest in ISI; however, my daughter owns approximately two million shares out approximately seven million outstanding shares of ISI and is an officer of ISI.

26. **Creditor and Shareholder Support for the Plan** – As detailed in the Scheduling Motion, the Debtor obtained the support for the Plan from all of its unsecured creditors prior to the Petition Date. Further, the Debtor also obtained support from shareholders that qualify as "Accredited Investors" that hold over three fourths (over 75%) of the Debtor's outstanding shares. Accordingly, as of the Petition Date, the Debtor has sufficient votes of prepetition creditors and equity holders to confirm the Plan.

27. **Solicitation and Confirmation Schedule** – On the Petition Date, the Debtor filed its Plan, Disclosure Statement, and the Scheduling Motion. The Scheduling Motion seeks an order setting dates and deadlines in connection with confirmation of the Plan, and approval of the Disclosure Statement and certain related deadlines. Specifically, the Scheduling Motion proposes the following schedule:

| Date and Time | Event |
|---|---|
| November 22, 2021 | Voting Record Date[1] |
| November 22, 2021 | Commence Solicitation |

---

[1] The "Voting Record Date" is the date as of which a holder of record of a claim entitled to vote on the Plan must have held such claim or interest to cast a vote to accept or reject the Plan.

| | |
|---|---|
| November 30, 2021 | Petition Date |
| December 13, 2021 | Voting Deadline |
| December 2, 2021 | Confirmation Hearing Notice Date |
| December 15, 2021 at 5:00 p.m. prevailing central time | Objection Deadline |
| December 20, 2021 | Deadline for Filing Replies to Confirmation Objections |
| December 22, 2021 | Confirmation Hearing |

28. I believe that implementation of the transactions contemplated by the Plan will position the Debtor to satisfy the claims of its creditors and shareholders and presents the best value-maximizing path forward. Alternatively, liquidation of the Debtor's assets is unlikely to generate any meaningful recovery to creditors and shareholders would receive nothing.

**D.     Evidentiary Support for First Day Motions.**

29. Contemporaneously herewith, the Debtor has filed a number of First Day Motions seeking orders granting other various forms of relief intended to facilitate the efficient administration of this chapter 11 case and expedite a swift and smooth restructuring. The First Day Motions include the following:

- *Emergency Motion for Order (1) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (2) Approving the Solicitation Procedures and Dates, Deadlines, and Notices Related Thereto, (3) Directing that a Meeting of Creditors Not Be Convened, (4) Waiving the Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities, and (5) Granting Related Relief* [ECF No. 9]; and

- *Emergency Motion for Entry of an Order Authorizing the Debtor to Redact Certain Personal Identification Information and Granting Related Relief* [ECF No. 8].

30. I am familiar with the content and substance contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtor to effectuate

the mergers contained in the Plan, (b) constitutes a critical element in the Debtor achieving a successful reorganization, and (c) best serves the Debtor's estate and creditors' interests. I have reviewed each of the First Day Motions and the facts set forth therein are true and correct to the best of my knowledge and are incorporated herein in their entirety by reference. If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions.

31. Specifically, as to the Redaction Motion, approximately fifteen percent (15%) of the Debtor's outstanding common shares are held by approximately one hundred and sixty (160) individuals, each holding a few thousand or hundred shares and all holding less than one percent (1%) of the outstanding shares. Given the large number of small individual shareholders, the Debtor has no certainty whether a release of these shareholder's private addresses could potentially jeopardize that individual's safety. Accordingly, the Debtor, out of an abundance of caution, seeks to redact addresses on the publicly filed lists of equity holders and related service lists. The Debtor will proceed to serve all such parties at the last known address reflected in the Debtor's records.

32. Further, as to the Scheduling Motion, the Lender is willing to fund a limited amount to pay the administrative costs of this Case. As the Debtor has (i) unanimous creditor support for the Plan from its creditors and (ii) solicited and obtained support for and ballots in favor of the Plan from all shareholders the Debtor identified as "Accredited Investors", which comprised 12,415,636 shares voting yes out of the total outstanding share of 16,260,546 (totaling over seventy-five percent (75%) of the Debtor's outstanding shares), the Debtor need only solicit votes from the remaining shareholders, approximately 165 parties, that each own a small fraction of the Debtor's outstanding shares.

33. Accordingly, the Debtor can efficiently provide these shareholders the Plan and

Disclosure Statement with reasonable time for them to consider the Plan, submit a ballot or objection, and proceed to Plan confirmation on an expedited basis. As the Debtor lacks funds for a protracted chapter 11 process, the proposed timeframe is critical to the success of the Plan and this Case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: December 1, 2021

/s/ James Walsh
James Walsh
Chief Executive Officer
Hawaiian Vintage Chocolate Company, Inc.